**McPHERSON'S LTD., et al., Plaintiffs,**

v.

**WILKINSON SWORD, INC., Defendant.**

**No. 86 C 2176.**

United States District Court,
N.D. Illinois, E.D.

Sept. 2, 1986.

Daniel I. Schlessinger, Lord, Bissell & Brook, Chicago, Ill., for plaintiffs.

John McClure, Arnstein, Gluck, Lehr, Barron & Milligan, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

On August 18 and 19, 1986 this Court conducted an evidentiary hearing ("Hearing II") on a rule to show cause whether any or all of Wilkinson Sword, Inc. ("Wilkinson"), Allegheny International, Inc. ("Allegheny"), Oliver Travers ("Travers") and Anthony Shanagher ("Shanagher") should be held in contempt of court for having violated the Order referred to in Finding 1.[1] At the conclusion of Hearing II this Court determined that:

1. Each of Travers, Shanagher and Wilkinson had not violated the Order—the latter solely in a technical sense (but see Conclusion 2 and n. 6) because of the division of functions in the Allegheny corporate structure referred to in the following Findings.

2. Allegheny had violated the Order in the manner stated in the following Findings and Conclusions.

Accordingly the rule to show cause was discharged as to Travers, Shanagher and Wilkinson, and the following Findings of Fact ("Findings") and Conclusions of Law ("Conclusions") are entered as to Allegheny in accordance with Fed.R.Civ.P. ("Rule") 52(a).[2]

### Findings of Fact

1. On April 3, 1986, after an evidentiary hearing ("Hearing I") held on plaintiffs' motion, this Court entered a preliminary injunction order (the "Order") restraining Wilkinson and Allegheny from selling self-sharpening knives manufactured by plaintiffs (the "Wiltshire Products") and granting additional relief specified in the Order.

2. Wilkinson is a wholly-owned second-generation subsidiary of Allegheny. Wilkinson-Canada is a wholly-owned fourth-generation subsidiary of Allegheny, though not in the same line of direct descent as Wilkinson from their common "parent" (in the generic sense) Allegheny. Throughout the period referred to in this Findings and Conclusions, Allegheny has had and exercised sole control over establishing and maintaining the lines of formal corporate organization and the contrasting lines of real-world business organization of its subsidiaries, including Wilkinson and Wilkinson-Canada.

3. Until December 31, 1985, in accordance with a written contract between Wilkinson and Wiltshire, Wilkinson had the exclusive distributorship rights of the Wiltshire Products in Canada and the United States. Though the principal focus of that contract was on sales and distribution within the United States, the first-listed among the "Territories" it covered was "Canada." Consistently with that, the actual conduct of business under the contract by the parties continuously embraced Canada, and the Wilkinson Businesses (see Finding 8) treated the operations for distribution of the Wiltshire Products as "North American" (including Canadian) operations, not limited to the United States. By its unilateral decision as to the manner in which the distributorship rights were to be exercised, Allegheny (acting through the Wilkinson Businesses) caused all United States purchases of the Wiltshire Products to be made by Wilkinson and all Canadian purchases to be made by Wilkinson-Canada.

1. Though the rule to show cause had also been directed to Wilkinson Sword Canada, Inc. ("Wilkinson-Canada"), a Canadian corporation, and Alan Fletcher ("Fletcher"), a resident of the United Kingdom, they were not involved in the hearing. This Court had stayed proceedings as to each of them because, given their status as foreign nationals, serious questions existed as to this Court's ability to assert personal jurisdiction over either of them.

2. To the extent if any the Findings as stated reflect legal conclusions, they shall be deemed Conclusions; to the extent if any the Conclusions as stated reflect factual findings, they shall be deemed Findings.

In doing so, and for all the purposes dealt with in these Findings and Conclusions, Allegheny (acting, as already stated, through the Wilkinson Businesses) employed Wilkinson as its agent, and not simply as an independent subsidiary.

4. Wilkinson and Wiltshire agreed to terminate the contract as of December 31, 1985. That agreement reflected a decision by Allegheny's overall policymakers for the Wilkinson Businesses, designated for that purpose by Allegheny (see Finding 8). Though the formal contracting party with Wiltshire had been Wilkinson (by Allegheny's choice), the de facto contracting party for the equitable purposes dealt with in these Findings and Conclusions (though it may not necessarily have been such for purposes of Wiltshire's recovery of the unpaid purchase price of any goods) was Allegheny.[3]

5. Through their words and conduct, Wiltshire and Wilkinson (the latter acting as agent for the Wilkinson Businesses and hence Allegheny as previously described) demonstrated their understanding that they had agreed to terminate Wilkinson's distributorship in Canada as well as the United States. For example, they unsuccessfully negotiated for a new agreement in Canada, and the post-termination correspondence regarding the terminated agreement refers to "North American sales" rather than just "United States sales."

6. This Court's Order was entered to enforce the parties' already-described agreement to terminate the distribution contract by prohibiting Wilkinson (acting in its previously-described capacity) from continuing to purport to be the authorized distributor for the Wiltshire Products.

7. During the period that Wilkinson was the authorized and exclusive distributor for the Wiltshire Products, both Wilkinson-Canada and (in the manner described in the preceding and following Findings) Allegheny itself were directly and intimately involved in selling the Wiltshire Products and other products marketed under the Wilkinson Sword name.

8. Allegheny has caused the business of selling Wilkinson Sword branded products to be, and it continues to be, carried on through a functional structure (the "Wilkinson Businesses") operated wholly without regard to the formal corporate structure of the Allegheny organization.[4] That operation, and examples of such disregard of corporate structures by Allegheny, include the following:

(a) For functional operational purposes, the "Wilkinson Businesses" have been set up and conducted by Allegheny as a separate overall operating business enterprise, embracing all the products (including, during the period relevant to these Findings and Conclusions, the Wiltshire Products) that Allegheny regards as part of the Wilkinson Businesses from time to time. Those Wilkinson Businesses are planned and carried on without regard to corporate formalities or entities: Indeed, the arrangement under which Wilkinson was the contracting party as to the Wiltshire Products, while purchases under the contract were made by both Wilkinson and Wilkinson-Canada, is merely illustrative of the business practices and procedures Allegheny established and caused to be carried on under the Wilkinson Businesses rubric.

(b) Allegheny is the planner and engineer of the business-oriented organization in which the Wilkinson Businesses are thus carried on without regard to corporate structure or formality. Allegheny is also directly involved in formulating business and marketing plans for the Wilkinson Businesses. Lines of reporting, supervision and management of

---

3. It is cumbersome for these Findings and Conclusions to refer constantly to Allegheny only in conjunction with its unincorporated functional business structure, Wilkinson Businesses. Accordingly all future references to Allegheny alone should be understood as doing so because

of the method by which Allegheny conducts the Wilkinson Businesses.

4. All the evidence in this respect emerged from Allegheny's own testimony at Hearing II. Shanagher's testimony was especially illuminating.

the Wilkinson Businesses were and are dictated by Allegheny to conform to what it views as the practicalities of the business operations, without regard to formal corporate structure.

(c) Not only the Wiltshire Products but Wilkinson Sword products generally have been and are sold in Canada by Wilkinson-Canada. Its stock is owned through a succession of third, second and first generation subsidiaries of Allegheny that have nothing to do with the Wilkinson Businesses and have no formal connection to any of the other Allegheny subsidiaries that are involved in the Wilkinson Businesses. In direct contrast to that corporate structure, Wilkinson-Canada (just as Wilkinson) functions on a practical level as part of the group comprising the Wilkinson Businesses.

(d) Reporting and planning of sales for Wilkinson and Wilkinson-Canada has, at times, been done through a fictitious entity known as "Wilkinson Sword North America," which never had any formal existence, but which had a "president" and otherwise was represented by Allegheny as having a legal existence.

(e) Fletcher, who has been designated by Allegheny to act, and does act, as the general manager and chief executive of the Wilkinson Businesses, directly supervises the operations of Wilkinson and Wilkinson-Canada. Fletcher is not an officer of either Wilkinson or Wilkinson-Canada, nor is he an officer of any of the Allegheny subsidiaries through which Wilkinson-Canada is owned, yet he directs and controls the Presidents of Wilkinson and Wilkinson-Canada and is closely involved in the development and execution of the overall business and budget plans that govern Wilkinson and Wilkinson-Canada. Fletcher is a vice-president of Allegheny and reports directly to Allegheny's Chairman and Chief Executive Officer.

(f) For nearly two years Travers (now Allegheny's Chairman, President and Chief Executive Officer), who was the man then elected as President of Wilkinson and reflected as President on all official records, was never informed of his position, never acted as such President, and, in fact, had little or nothing to do with Wilkinson's operations. Instead another man, Norman Proulx, functioned as Wilkinson's President, thought he actually was its President, and was represented to the public as Wilkinson's President through press releases, business cards and other representations made by Wilkinson.

9. Allegheny's legal department handles legal matters for all Allegheny subsidiaries, including Wilkinson and Wilkinson-Canada. During the course of Hearing I, Allegheny's senior corporate counsel Warren Archer ("Archer," an in-house lawyer who reports directly to Allegheny's General Counsel) specifically represented that Allegheny's purpose [5] in continuing to sell the Wiltshire Products after termination of the contract with Wiltshire was to continue to hold a place in the market for self-sharpening products while developing Allegheny's own competing product line. Allegheny's counsel stated on the record that Allegheny had inventory of Wiltshire Products in the United States usable for that purpose, *but had no inventory in Canada usable for that purpose.*

10. Though the representation made by Allegheny's counsel, as described in Finding 9, was not a willful falsehood on his part individually (he was relaying information that had been given to him by John Hagerman ("Hagerman"), the President and operating head of Wilkinson-Canada), it was false, and misleadingly and materially so. It was thus a materially false and misleading representation by *Allegheny,* then a party defendant in this action. Its direct effect was twofold:

5. True enough, Archer did not speak in terms of "Allegheny's" purpose. But at the time of Hearing I the nature of Allegheny's conduct of the Wilkinson Businesses operation, and its disregard of formal corporate limitations, had not yet been disclosed to plaintiffs and this Court—those matters emerged only during Hearing II. Accordingly there is no question the Archer representation (as will be seen, a misrepresentation) is ascribable to Allegheny.

(a) It caused the sole focus of Hearing I, and therefore the portion of the Order that dealt with existing inventory of the Wiltshire Products, to center on the quantity of those products in the United States (and not at all on the quantity in Canada).

(b) It made it unnecessary to explore, during the course of Hearing I, any of the intra-Allegheny organizational matters dealt with in these Findings.

11. On April 30, 1986 Allegheny was dismissed as a defendant in this action on its motion, without objection by plaintiffs. Though revisionist history can never be written with total assurance, it is unquestionably true that plaintiffs' (and this Court's) position on the subject of Allegheny's dismissal would have been materially different had the misrepresentation described in Finding 9 not been made. Plaintiffs' Complaint, prepared and filed under time constraints, had identified Allegheny's involvement solely in terms of its being Wilkinson's parent corporation (and that was the basis of its motion to dismiss). But had Allegheny's counsel known (and therefore truthfully represented) the facts as to the Wilkinson-Canada inventory of Wiltshire Products, Hearing I would undoubtedly have explored the matters referred to in these Findings (rather than such matters being learned only in preparation for, and during the conduct of, Hearing II). It is highly likely that such an altered course of this litigation would have occasioned (a) a motion by plaintiffs to amend the pleadings to conform to those proofs and (b) plaintiffs' successful resistance to Allegheny's dismissal.

12. After the Order was entered, Allegheny continued, through its already-described Wilkinson Businesses operation, to market the Wiltshire Products in Canada through Wiltshire-Canada. Since April 3, 1986 Allegheny—acting through that operation—has sold nearly 40,000 units of Wiltshire Products.

13. In the meantime Wiltshire had entered the Canadian market, seeking to sell the same Wiltshire Products under the Wiltshire name. Wiltshire had product in Canada available for sale as early as March 1986. Part of Wiltshire's marketing strategy involved representing itself as the exclusive source for the Wiltshire Products in Canada. Wiltshire's marketing strategy also involved selling two distinct product lines of the Wiltshire Products: an inexpensive line directed to discount-type stores and a higher-quality line directed to department stores and other upscale retailers.

14. Allegheny's sales through Wilkinson-Canada interfered directly with Wiltshire's marketing strategy by contradicting Wiltshire's representations of its own exclusivity. Allegheny's activities through Wilkinson-Canada, by selling the Wiltshire Products at substantial discounts, including sales of the higher quality line at distress prices to discount-type stores, impaired Wiltshire's efforts to distinguish the product lines in accordance with its marketing strategy. Once a product line becomes available as a discount item, it is especially difficult to convince upscale retailers to carry the item.

15. When Wiltshire became aware of the apparent violation of the terms of the Order by Wilkinson-Canada (it did not then know the facts of Allegheny's internal operations and the structure—or, more accurately, the lack of formal corporate-line structure—under which Allegheny conducted the Wilkinson Businesses, as developed at Hearing II and stated in these Findings), plaintiffs' counsel requested Allegheny to cease the wrongful activity. Allegheny refused, taking the position that the Order did not affect any Canadian activities of Wilkinson-Canada. For the reasons stated in these Findings and Conclusions, that position is rejected by this Court because those activities are ascribable to Allegheny itself.

16. There are two major annual trade shows in Canada during which products such as the Wiltshire Products are shown. One of those is the Gift Show, held this year from August 10 to August 14 at the International Centre in Toronto.

17. On August 1, 1986 plaintiffs filed a motion for a rule to show cause why Wilkinson should not be held in contempt for violating the Order. On August 5 the motion was heard, and this Court requested submissions from both sides. In the motion and in oral comments to this Court, plaintiffs' counsel emphasized there was urgency involved because the Gift Show was to begin August 10 and because irreparable harm of the very nature that had warranted the issuance of the Order would occur if Wilkinson-Canada appeared at the show exhibiting the Wiltshire Products.

18. On August 8 this Court confirmed that the Order indeed applied to Canadian sales of the Wiltshire Products, and further expressed the opinion that Wilkinson-Canada was bound by the order as a "person acting in concert or participation" with Wilkinson, or with both Wilkinson and Allegheny. This Court emphasized that if Wilkinson-Canada exhibited Wiltshire Products at the Gift Show, it would be acting at its peril. It should be stressed that the nature of Allegheny's direct involvement with those sales, though of course well-known to Allegheny and (through it) to its subsidiaries such as Wilkinson-Canada, was not then known by plaintiffs, their counsel or this Court—in substantial part as a consequence of the misrepresentation described in Finding 9 and its effect on the conduct of Hearing I.

19. In a telephone conversation on the evening of August 8, Allegheny's senior corporate counsel Archer discussed this Court's comments during that day's hearing with Fletcher, the Allegheny vice-president in charge of the Wilkinson Businesses in general and Wilkinson-Canada's activities in particular. Additionally plaintiffs sent a written summary of the Court's comments to Fletcher and Hagerman, the President of Wilkinson-Canada, by August 10.

20. Despite those notifications and its own knowledge of its own direct involvement in (and therefore its own responsibility for) the distribution of the Wiltshire Products, Allegheny (through Wilkinson-Canada) proceeded to exhibit the Wiltshire Products at the Gift Show. As with the Chicago show that was the initial stimulus for the bringing of this action, the purpose of the Gift Show is to generate interest and solicit future orders for product. Implicit in Allegheny's presentation of the Wiltshire Products at the Gift Show was a representation that Wilkinson-Canada would be an ongoing source for those goods.

21. Allegheny's discount-price sales of the Wiltshire Products in Canada, and its representations regarding those products, have deprived Wiltshire of profits on sales it otherwise would have made, have caused confusion in the trade and have sabotaged Wiltshire's marketing strategy in Canada.

22. On August 11 plaintiffs filed a motion to amend the rule to show cause. On August 13 the motion was granted and the rule was amended to name Allegheny, Wilkinson-Canada, Travers, Shanagher and Fletcher in addition to Wilkinson. After oral argument on the subject, prior to the date of Hearing II this Court stayed any proceedings against Wilkinson-Canada and Fletcher (see n. 1). Accordingly Hearing II dealt only with the remaining respondents.

### Conclusions of Law

1. Allegheny was specifically bound by the Order at the time it was entered. Though the April 30, 1986 order dismissing Allegheny as a defendant did not address its position as an entity covered by the Order (neither side then raised that issue), that has no effect for current purposes. Whether as an entity specified in the Order by name or as a "person in active concert or participation" with Wilkinson, Allegheny continues to be bound to the same degree today. Wilkinson has acted throughout the term of its distributorship contract (as evidenced in part by the use of that contract as the basis for sales of the Wiltshire Products by Wiltshire to Wilkinson-Canada, the corporate entity designated by the Wilkinson Businesses for that purpose), and also since the termination of that contract, as the agent for the Wilkinson Businesses—and that means for

Allegheny itself. This is not at all a matter of judicially "piercing the corporate veil" despite a party's interposition of corporate structures. On the contrary, Allegheny—having itself chosen to conduct its business activity by the overlay of a supra-corporate business-oriented structure (the Wilkinson Businesses), and to do so in disregard of the boundaries of corporate organization—will not now be heard to limit its own responsibility by raising as a defense the same corporate boundaries it has ignored in the planning and conduct of the Wilkinson Businesses. Whether that proposition is labeled as an estoppel operating against Allegheny or otherwise, Allegheny's dismissal as a defendant in this action did not diminish its obligation to respect and obey the Order. *Major v. Orthopedic Equipment Co.*, 496 F.Supp. 604, 610–11 (E.D.Va. 1980).

■ 2. Allegheny has acted in active concert or participation with Wilkinson, and Wilkinson-Canada has acted in active concert or participation with each of Allegheny and Wilkinson, within the meaning of Rule 65(d). Because Wilkinson has acted throughout (as Conclusion 1 has determined) as the agent for Wilkinson Businesses, and hence for Allegheny itself, all violations of the Order by Wilkinson Businesses by causing Wiltshire Products (obtained under the authority of Wilkinson's contract) to be sold in Canada constitute—in law—violations by Allegheny as a "person in active concert or participation with" Wilkinson. Because the nature of the corporate structure set up by Allegheny (but ignored by it for operating purposes) precludes Wilkinson itself from directly causing Wilkinson-Canada to take or refrain from taking action, but solely for that reason, the rule to show cause is being discharged as to Wilkinson. Allegheny cannot however escape *its own* responsibility by arguing the party to the Order—Wilkinson—"did not violate it."

■ 3. Through Allegheny's direct operation of the Wilkinson Businesses, Wilkinson-Canada acts with respect to the sale of Wilkinson Sword branded products (and in this instance with respect to the sale of the Wiltshire Products) as the mere instrumentality of Allegheny, for Wilkinson-Canada has been and is subject to Allegheny's direct control without regard to corporate formality. Wilkinson-Canada and Allegheny are closely identified with respect to the sale of Wilkinson Sword branded products and represent identical legal interests, such that Wilkinson-Canada's sales of, and business conduct as to, the Wiltshire Products following the Order were violations of the Order. See *G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 35, 40 (1st Cir.1980); *Peterson v. Fee International, Ltd.*, 435 F.Supp. 938, 942–43 (W.D. Okla.1975).

■ 4. This Court's Order (and particularly Order ¶ 1(b) through (e) and the obligation to have returned all the Wiltshire Products to Wiltshire) applies to all of the Wiltshire Products in North America (including Canada), whether owned or sold by Allegheny, Wilkinson or anyone (including Wilkinson-Canada) acting at the direction or control of either or both. By its terms, the Wiltshire-Wilkinson contract that the parties terminated December 31, 1985 specifies that it covers both Canada and the United States, and the parties, by their words and actions, manifested their understanding that the contract was terminated for Canada as well as for the United States.

5. By reason of the foregoing Findings and Conclusions, the Order acts in personam on Allegheny and is not less effective with respect to goods located in Canada, regardless of the fact that they are outside the boundaries of the United States. *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289, 73 S.Ct. 252, 97 L.Ed. 319 (1952) (numerous citations and footnote omitted):

> Where, as here, there can be no interference with the sovereignty of another nation, the District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction....

6. This Court has a responsibility to take such reasonable actions as are within its authority to enforce its orders. This order as to Allegheny, and the actions this order reflects, are well within this Court's authority. *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir.1985). *Waffenschmidt, id.* at 716–17 provides direct authority for holding Allegheny to the terms of the Order and holding it in contempt for violation of the Order.

■ 7. Allegheny has acted in civil contempt of the Order by, either directly or through Wilkinson-Canada:

(a) representing that it is authorized to distribute Wiltshire's self-sharpening products;

(b) representing that it has the ability to fill orders for self-sharpening products with Wiltshire Products beyond the 1,404 units permitted under Order ¶ 1(c); and

(c) selling Wiltshire's Products in quantities exceeding those 1,404 units.

8. Because Allegheny is before this Court, with full capacity to remedy the contempt of court and to prevent its recurrence, and because (as already stated) no showing has been made that any of respondents Travers, Shanagher and Wilkinson[6] was directly involved in any decision to violate the Order, each of those respondents is discharged from the rule and this contempt proceeding.

9. Wiltshire has been damaged in these respects by Allegheny's violation of the Order:

(a) Wiltshire has lost profits on sales of Wiltshire Products it would have made but for Wilkinson-Canada's having made the sales.

(b) Wiltshire has lost sales and will continue to lose sales from confusion in the market caused by Wilkinson-Canada's representations as to, and sales of, Wiltshire Products.

(c) Wiltshire's marketing strategies have been diminished or destroyed in their effectiveness as a result of Wilkinson-Canada's "dumping" of Wiltshire's product lines.

(d) Wiltshire has incurred costs and attorneys' fees in its efforts to cause cessation of Allegheny's contumacious conduct and obtain relief.

10. To compensate Wiltshire for the harm it has suffered by reason of Allegheny's contempt, sanctions will be imposed against Allegheny in a form and amount to be set by further order of this Court.

---

6. Once again, Wilkinson's insulation from direct liability is caused by Allegheny's choice of corporate structuring—but that structuring, and Allegheny's ignoring of it for business purposes, inculpates Allegheny while technically exculpating Wilkinson.