**Terry J. WILKINS, Plaintiff,**

v.

**Donald E. JAKEWAY, et al., Defendants.**

No. C–2–93–1159.

United States District Court, S.D.Ohio, Eastern Division.

Jan. 22, 1998.

Alexander Morris Spater, Spater, Gittes, Schulte & Kolman, Columbus, OH, for Plaintiff.

Pamela J Gordon, Ohio Atty. Gen., Columbus, OH, for defendants.

### OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court on Defendants' motion for summary judgment. Plaintiff, Terry J. Wilkins, claims that Defendants, Donald E. Jakeway, Director of the Ohio Department of Development ("ODOD"), Vincent Lombardi, Assistant Director of ODOD, and Roberta Garber, Deputy Director of the Community Development Division of ODOD, improperly terminated Plaintiff. Specifically, Plaintiff claims Defendants terminated him for reporting to his supervisors and the Ohio Inspector General both the misuse of state and federal funds and "the violation of laws and policies by community action agencies and state employees' involvement in and knowledge of such violations." (Doc. # 10 at ¶ 14.) Plaintiff brings his claim pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments. Defendants move for summary judgment on Plaintiff's claims asserting that these claims are barred under claim preclusion. Further, Defendants assert that Plaintiff fails to make out a claim under the First Amendment. For the reasons set forth below, the Court **GRANTS** Defendants' motion. The Court finds that Plaintiff's case is barred by the doctrine of claim preclusion. Thus, the Court need not consider Defendants' arguments with respect to the First Amendment. The Court finds that a decision reached in another case in this Court, *Wilkins ex rel. United States v. Ohio*, No. C–2–94–720, slip op. (S.D. Ohio filed Feb. 4, 1997), bars Plaintiff from bringing this case because this case involves a claim that should have been raised in that action. Consequently, summary judgment is appropriate.

### I. FACTS[1]

#### A. Background

Plaintiff, Terry J. Wilkins, was formerly employed by the Ohio Department of Devel-

---

1. The Court discerned a majority of these facts from Judge Graham's opinion in *Wilkins ex rel. United States v. Ohio*, No. C–2–94–720, slip op. (S.D. Ohio filed Feb. 4, 1997). As noted, *infra*, this Opinion and Order relies on the preclusive effects of Judge Graham's Order. The Court

opment as the chief of the Office of Community Services ("OCS").

Defendant, Donald E. Jakeway, is the Director of ODOD. Defendant, Vincent Lombardi, is the Assistant Director of ODOD. ODOD is required under Ohio law to ensure that state resources are being properly used. ODOD also assists local governments and community organizations. Specifically, ODOD may apply for federal funding and administer this funding to various local governmental agencies or private organizations. ODOD contains several divisions and offices established to provide assistance to local communities.

The Community Development Division ("CDD"), one such division of ODOD, was run at the time in question by Defendant, Roberta Garber, the deputy director of CDD. Garber reported to Jakeway through Lombardi.

OCS, as an office within CDD, is responsible for monitoring agencies receiving federal and state funding for the needy. Plaintiff's job, in part, entailed ensuring that these agencies complied with applicable state and federal regulations governing the receipt of funds. One of OCS's major responsibilities involves administering federal funding obtained from the United States Department of Health and Human Services ("HHS") under the Community Services Block Grant Act. *See* 42 U.S.C. § 9901 (1996). OCS also designates community action agencies ("CAAs") to receive Community Service Block Grant ("CSBG") funds. CAAs are community–based and operated private nonprofit agencies or organizations providing a range of services that impact poverty. In addition, OCS provides technical assistance to CAAs to improve program planning, development and administration; conducts yearly performance assessments of CAAs; prepares an annual report to be submitted to HHS; and serves as a statewide advocate for social and economic opportunities for low-income persons.

ODOD also has an audit office that provides services to all of ODOD's various divisions and offices. The Audit Office devotes most of its efforts towards auditing CAAs and other subgrantees that receive funding through the various state and federal grant programs administered by ODOD's divisions.

The Audit Office conducts grant audits of CAAs. A grant audit looks at the expenditure of grant funds received from ODOD by CAAs but does not address the overall financial condition of the CAA or examine how the CAA spends funds other than the grant funds received from ODOD. Prior to 1990, the Audit Office generally audited each CAA once every two years. This audit, which featured a field inspection as well as an office review afterwards, included an inspection of the CAA's internal control system and other types of reviews of the CAA to ensure that the CAA was functioning properly.

After January 1990, federal law required CAAs to obtain an annual "single agency" audit by a private independent auditor. These single agency audits examined the entire operations of a CAA rather than focusing on the CAA's use of funds from a particular grant. After January 1990, the Audit Office would review these single agency audits. However, the Audit Office concentrated its attention on risky CAAs and would not audit a CAA unless the single agency audit revealed a problem.

### B. Plaintiff's Concerns

In 1990 and 1991, Plaintiff became concerned with the performance of the ODOD Audit Office and frequently criticized Melanie Buller, who headed that office. Plaintiff and Buller disagreed over the Audit Office's responsibilities. Plaintiff felt that the Audit Office was not doing an adequate job for OCS, and Buller thought that Plaintiff was trying to monopolize the services of the Audit Office at the expense of other ODOD offices served by the Audit Office.

Plaintiff's frequent criticism apparently drew the ire of his supervisor defendant Garber. Plaintiff claims that Garber accused him of not being a team player. Further, Plaintiff claims that Garber told him not to

---

summarized many of the facts in order to give some context to the events in question. The Court also notes that from its examination of the record in this case, many of the documents submitted in *Wilkins ex rel. United States* were also submitted by the parties in this case.

discuss Audit Office problems in front of the new ODOD officers, including defendants Jakeway and Lombardi who came to ODOD after Governor Voinovich took office.

Plaintiff and Garber began to clash over Plaintiff's actions at work. Garber eventually held a counseling session with Plaintiff. During the session, Garber criticized Plaintiff's attitude at work.

### C. Problems with CAAs including LACAC

Around this time, ODOD audits of various CAAs uncovered various problems in funding. One of the most serious problems was discovered in the management of the Lima–Allen County Community Action Committee ("LACAC"). From 1987 to 1991, grant audits by the Audit Office revealed questioned costs and irregularities in LACAC's record keeping practices and fiscal management systems; the audits (and program reviews by OCS), however, failed to disclose any significant problem with the expenditure of CSBG funds. Even Plaintiff, the head of the office in charge of monitoring the use of the block grant funds to LACAC, failed to suspect that LACAC was in financial trouble or that corrective action was warranted. In July 1991, a single agency audit disclosed that LACAC operated at a deficit. Further investigation uncovered that the agency had a deficit of funds for other federal grants; all of the funds for CSBG were, however, accounted for. Soon afterwards, funding was terminated and the agency was closed.

The audits also showed that LACAC had been passing funds back and forth from Level One, a separate corporation formed by LACAC in 1983 to buy and rehabilitate housing to rent or sell to low-income families. LACAC purchased homes on a land contract, sold them to Level One, and leased the homes back from Level One. This property then reverted to the original owner when LACAC and Level One defaulted on the payments. Four other homes were mortgaged through bank loans.

In April 1992, at a CDD meeting, Plaintiff voiced his concerns that another CAA that was in trouble. Plaintiff also loudly complained about the Audit Office's performance; he further stated that he wanted to discuss the Audit Office's problems with LACAC. Garber eventually told Plaintiff to stop talking about these items. Plaintiff later claimed that he was told not to complain about the Audit Office because Melanie Buller, head of the Audit Office, might lose her job.

### D. Plaintiff's Performance Criticized

In 1992, Plaintiff received a generally positive work evaluation from Garber. The evaluation did contain a few criticisms that Plaintiff disagreed with. Plaintiff sent a memo to Assistant Director Lombardi attempting to explain Plaintiff's views and to explain why the criticisms were unfair. In response, Lombardi contacted Garber and suggested Garber write a memo to Director Jakeway describing Plaintiff's performance.

Garber's subsequent memo recommended that Plaintiff be terminated because of what Garber considered to be Plaintiff's inappropriate behavior. Garber noted that she could no longer trust Plaintiff to handle sensitive issues in a responsible manner. Lombardi supported Garber's recommendation that Plaintiff be terminated. Kathy McNeal, ODOD's human resource officer, testified that she opposed this recommendation and that Jakeway also opposed it initially. Jakeway, however, testified that he did not speak to McNeal about the memo.

In June 1992, Lombardi discussed with Jakeway the problems that had occurred at LACAC. Jakeway questioned why the problems at LACAC had gone unnoticed and uncorrected for so long, and decided to refer the matter to the Ohio Inspector General. The Ohio Inspector General then began an investigation into the problems at LACAC. Although Defendants have presented evidence that Jakeway initiated this investigation in June 1992, Plaintiff claims the investigation began in July after he complained to members of Jakeway's staff about the Audit Office.

### E. Plaintiff Holds Meetings To Discuss Complaints

During this time period, Plaintiff had a meeting with Anthony Whitmore, Jakeway's assistant director of minority affairs, and discussed the Audit Office's failure to discover

evidence of wrongdoing at LACAC, Buller's failure to act, Garber's instructions not to discuss the inadequacies of the Audit Office, and Plaintiff's fear that Garber and Buller might retaliate against him due to his complaints about the Audit Office. Plaintiff also met separately with Kathy McNeal and told her about the problems with the alleged misuse of funds at various CAAs, including LACAC.

Following these meetings, Plaintiff held a meeting involving both McNeal and Whitmore and others. At this meeting, Plaintiff discussed the problems he observed. Plaintiff claimed that Garber and Buller would retaliate against him for speaking out. After the meeting, Plaintiff claimed that he was told by an attendee at the meeting that Jakeway would protect him.

On July 28, 1992, as part of the Inspector General's investigation, Plaintiff met with staff from the Ohio Inspector General's office. Plaintiff complained about the deficiencies of the Audit Office and indicated that Garber had instructed him not to discuss these issues with others due to the change in administration. During the course of the meeting, Plaintiff referred to problems at CAAs, including LACAC, and noted questioned costs and delays in completing audits. When questioned, Plaintiff denied that he faced termination but commented that if he did his job properly, he would face disciplinary action.

A week after his meeting with the Inspector General's office, on August 5, 1992, Plaintiff received a written reprimand from Garber for insubordination and neglect of duty. Garber also took the unprecedented step of having Plaintiff submit weekly itineraries of his whereabouts to her. Lombardi also apparently met with Plaintiff to discuss the reprimand. Plaintiff asserts that Lombardi told him that he would be fired if Plaintiff voiced his concerns by going outside the chain of command or the department.

### F. Inspector General's Report and Its Consequences

On August 17, 1992, the Ohio Inspector General's office issued its report about the investigation of the problems at LACAC. The report found that the Audit Office and the program directors did not take appropriate action in regard to LACAC. Those program directors apparently included Garber and Plaintiff. In response to the report, Jakeway recommended that, among others, Garber and Plaintiff be terminated.

Lombardi and Garber felt that the report did not justify terminating anyone and both did not want Plaintiff's termination to be linked solely to the report. On October 6, 1992, Garber sent a memo to Jakeway criticizing the Inspector General's investigation. She also indicated her appreciation of Jakeway's support in her efforts to deal with Plaintiff's attitude. Garber reminded Jakeway that she had conducted numerous counseling sessions with Plaintiff; Garber further noted that Plaintiff would very likely respond to disciplinary action by becoming a whistleblower. In the meantime, Lombardi recommended various disciplinary alternatives to Jakeway.

On October 23, 1992, Jakeway issued written reprimands to both Garber and Plaintiff. Jakeway also decided to terminate Buller, the head of the Audit Office; Buller left ODOD in November 1992.

Plaintiff responded to Jakeway's written reprimand in a memo to Lombardi dated November 23, 1992. The memo stated that CDD—the division headed by Garber—did not have an adequate financial audit review capacity. Furthermore, the memo stated that other program offices did not do their share in reviewing reports to identify fiscal problems. Plaintiff also detailed his ideas about his view of what his job responsibilities entailed. These ideas differed from those of his supervisors. While Plaintiff felt that the Audit Office should ferret out fiscal irregularities, Defendants believed that Plaintiff was responsible for the great majority of oversight over CAAs. Consequently, Defendants felt that Plaintiff was primarily responsible for monitoring LACAC, and that he was therefore the most responsible in terms of program monitoring for the lack of oversight of LACAC.

### G. Garber Again Reprimands Plaintiff

On December 7, 1992, Garber sent a memo to McNeal requesting that she schedule a

hearing for a three-day suspension for Plaintiff. Garber expressed concerns about Plaintiff's conduct. Garber included a memo from Vicky Mroczek about Plaintiff's conduct at two separate meetings. At one of the meetings, Plaintiff admittedly made disparaging remarks about a female staff member.

On January 29, 1993, Garber issued another written reprimand to Plaintiff. Plaintiff apparently missed an assignment (Plaintiff was to submit a summary to her) because he was out of the office participating in the ODOD "Adopt a School" program. Garber claimed that because of Plaintiff's absence, she had little time to review his assignment. Further, Garber claimed that, within Plaintiff's summary, Plaintiff included a reference to a potential conflict of interest of a board president. This claim of a conflict of interest led to embarrassment for ODOD and unfavorable publicity. In his response, dated February 4, 1993, Plaintiff claimed that the Audit Office was responsible for the problem.

Plaintiff was also reprimanded for a failure to monitor his staff and for hiring a person who was actively seeking another ODOD position. This person ended up leaving a position with OCS shortly after being hired by OCS. Garber claimed that this vacancy undermined work at OCS. Finally, Garber reprimanded Plaintiff for being late. Plaintiff felt that he was being unfairly singled out for these complaints.

### H. Plaintiff's Termination

During the week of January 11, 1993, Garber testified that she decided to terminate Plaintiff after discussing the possibility of termination with Lombardi. Lombardi concurred in Garber's decision. Lombardi consulted with Jakeway on February 3, 1993. Jakeway approved the termination and indicated that he felt that Plaintiff should have been terminated in light of the Ohio Inspector General's report. Plaintiff was notified of his termination by a letter dated February 5, 1993 signed by Lombardi and a letter dated February 10, 1993 signed by Jakeway.

Garber received a memo from McNeal on February 4, 1993 in which McNeal identified reasons why Plaintiff, who is African-American, might file a civil rights action. Garber then sent a memo dated February 8, 1993 to Lombardi outlining McNeal's actions during the termination process. Garber indicated that McNeal had met with Plaintiff. Garber felt that McNeal's memo was one-sided in Plaintiff's favor and concluded that McNeal supported Plaintiff's position. McNeal testified that she sent a copy of this memo to Jakeway; Jakeway denied seeing the memo.

### I. Procedural History

#### 1. This Case

After his termination (and other legal procedures not relevant to this case), on December 14, 1993, Plaintiff filed this action pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the Constitution of the United States. Plaintiff also brought pendent state court claims. Plaintiff named Jakeway, Lombardi and Garber as Defendants. In Plaintiff's original complaint, Plaintiff alleged that he was harassed, disciplined and ultimately terminated from his position as Chief of the OCS. After Defendants filed a motion to dismiss or for summary judgment, on March 25, 1994, Plaintiff filed his Amended Complaint. Defendants then renewed their motion to dismiss or for summary judgment.

On September 22, 1994, this Court dismissed Plaintiff's pendent state law claims but denied the remaining portion of Defendants' motion. This Court found that Plaintiff pleaded facts which, if true, were sufficient to show that Plaintiff's activities in speaking out about the problems of ODOD was clearly protected by the First Amendment. Specifically, the Court found that Defendants were not entitled to qualified immunity on Plaintiff's First Amendment claims. Defendants appealed this Court's decision to the United States Court of Appeals for the Sixth Circuit alleging that they remain entitled to qualified immunity from this case because Plaintiff's speech was not clearly constitutionally protected. On February 27, 1996, the Sixth Circuit panel affirmed this Court's determination.

#### 2. A Second Case

In the interim, on January 31, 1994, Plaintiff filed a second action in this Court. *See Wilkins ex rel. United States v. Ohio*, 885

F.Supp. 1055 (S.D.Ohio 1994). The case was originally assigned to the docket of the Honorable George C. Smith. Plaintiff's action, filed under the False Claims Act, was brought on behalf of the United States. Plaintiff's complaint was kept under seal *in camera* pursuant to 31 U.S.C. § 3730(b)(2). On August 4, 1994, after an extension, the United States declined to participate as a party and Plaintiff's complaint was filed with the Clerk. Plaintiff's complaint named the State of Ohio, ODOD, Jakeway, Lombardi, Garber, and Melanie Buller, former Chief of the ODOD Audit Office, as Defendants. Plaintiff's complaint contained a number of *qui tam* counts in the name of the United States alleging that Defendants perpetrated numerous false claims against the United States in the course of applying for and administering various federal grants. Additionally, one of Plaintiff's claims was brought under the "whistleblower" provision of the False Claims Act for alleged harassment, disciplinary measures and termination by Defendants. *See id.*

Defendants moved to dismiss Plaintiff's claims for failure to state a claim. The case was reassigned to the Honorable James L. Graham who heard Defendants' motion. On January 31, 1995, in *Wilkins ex rel. United States v. Ohio*, 885 F.Supp. 1055 (S.D.Ohio 1995), Judge Graham overruled Defendants's motion in part and granted it in part, dismissing some of Plaintiff's claims and dismissing Buller as a defendant for the inadequacy of the complaint's factual allegations. Judge Graham also found that the state was entitled to immunity under the Eleventh Amendment from Plaintiff's "whistleblower" claim, entitling him, at most, to prospective equitable relief.

On March 1, 1995, Plaintiff filed a Second Amended Complaint adding factual allegations. In this complaint, Plaintiff asserted his claims against Jakeway, Lombardi and Garber in both their individual and official capacities. Plaintiff's complaint also contained counts directed against Melanie Buller.

On September 11, 1995, Judge Graham found that the Second Amended Complaint adequately asserted a false claim allegation. Further, Judge Graham allowed Plaintiff's claim to continue against Buller. Judge Graham also found that Wilkins could not avoid Eleventh Amendment immunity on his "whistleblower" claim. Plaintiff's "whistleblower" claim was brought pursuant to 31 U.S.C. § 3730(h) which allows liability only against "employers." Thus, Judge Graham found that Plaintiff could not assert his whistleblower claim against Defendants in their individual capacities and seek damages. Nevertheless, Jakeway remained a "whistleblower" defendant for the purposes of granting any equitable relief under the *Ex parte Young* doctrine.

As a result of Judge Graham's ruling, Plaintiff had claims remaining under the False Claims Act seeking to recover damages on behalf of the United States for false claims allegedly made to the federal government in conjunction with applications for federal grant monies. In addition, Plaintiff had a claim against his employer that he was allegedly terminated from his position under the "whistleblower" portion of the False Claims Act. *See Wilkins ex rel. United States*, No. C–2–94–720, slip op. at 1–14 (S.D. Ohio filed Sept. 11, 1995).

On January 19, 1996, Defendants filed their answer in *Wilkins ex rel. United States*. Among the other defenses listed, Defendants raised the defense of "res judicata." Because of the procedural posture involved, this answer was the first and only answer filed by Defendants in *Wilkins ex rel. United States*. *See id.*, Defs.' Answer to Pl.'s Second Am. Compl. (S.D. Ohio filed Jan. 19, 1996).

Just before February 27, 1996, when the Sixth Circuit affirmed this Court's ruling in this case, both parties filed a joint motion to extend the discovery deadline and to vacate the trial date in *Wilkins ex rel. United States*. In the joint motion, Plaintiff noted his continued opposition to consolidation of both cases. In the same motion, Defendants noted that they believed "there are serious *res judicata* and/or collateral estoppel difficulties" with Plaintiff pursuing separate claims "involving the same transaction (his discharge)." (Doc. 34 Ex. C.)

On July 10, 1996, Defendants filed a motion for summary judgment in *Wilkins ex rel. United States*. On October 17, 1996, Magistrate Judge Kemp conducted a pretrial conference in this case. In his memorandum, Magistrate Judge Kemp noted that "A related case is before Judge Graham.... The parties agreed to wait [Judge Graham's] ruling on that motion [for summary judgment] before determining how this case should proceed." (Doc. # 27.)

On February 4, 1997, Judge Graham granted Defendants summary judgment in *Wilkins ex rel, United States*. Judge Graham found against Plaintiff in his "whistleblower" claim. Specifically, Judge Graham noted that:

Plaintiff's supervisors were aware of plaintiff's complaints about instances of improper use of funds or potential acts of fraud by CAAs. However, it was plaintiff's job as chief of OCS to monitor the use of federal funds by CAAs and to report any failure to comply with applicable regulations. There is no evidence from which a jury could reasonably find that plaintiff was doing anything outside the scope of his job.... While plaintiff made broad allegations of fraud, there is no proof that he was investigating CAAs to determine if they had made false statements in their applications to the state for federal funding.

*Wilkins ex rel. United States*, No. C–2–94–740, slip op. at 79 (S.D. Ohio filed Feb. 4, 1997).

## J. Plaintiff's Causes of Action and Defendants' Motion

On April 11, 1997, Defendants filed a motion for summary judgment in this case. Plaintiff's first claim for relief alleges that Defendants violated the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. Plaintiff's Amended Complaint contains a number of factual allegations relating to this claim.

As part of the facts of his Amended Complaint, Plaintiff alleges that he reported:

what he believed to be serious problems regarding violations of state and federal law and policies, including but not limited to, the misuse of state and federal funds.

He also reported that state employees were aware of the violations and that these employees did nothing to correct the situation. He specifically reported his findings to [Garber, Lombardi, the staff of Jakeway and the Ohio Inspector General's office]. (Doc. # 10 at ¶ 8.) Further, Plaintiff alleges that Defendants "harassed plaintiff and threatened plaintiff's welfare, as well as his job, because of his having reported to his supervisors and the Ohio Inspector General the violations of state and federal laws and policies by [CAAs] and state employees' involvement in and knowledge of such violations." (*Id.* at ¶ 9.) Plaintiff notes that Defendants "acted individually and in conspiracy with the other defendants to discipline plaintiff and then to terminate him because of his having reported to his supervisors and the Ohio Inspector General violations of laws and policies by [CAAs] and state employees' involvement in and knowledge of such violations." (*Id.* at ¶ 14.)

Defendants move for summary judgment this claim on a number of different grounds. Defendants first aver that Plaintiff's claim is barred by the doctrine of "res judicata" or claim preclusion. In other words, Defendants allege that Judge Graham's opinion and final decision bars Plaintiff from bringing his cause of action in this case. Defendants also aver that Plaintiff's First Amendment claim is improper. Finally, Defendants renew their argument that the defense of qualified immunity applies, claiming that the change in procedural posture since their motion to dismiss allows the Court to revisit the issue. Much of Defendants' motion (over 135 pages) is spent rehashing the "factual" events that occurred during Plaintiff's tenure at ODOD.

In his memorandum contra, Plaintiff takes issue with all of Defendants' points. First, Plaintiff claims that "res judicata" does not apply to this case. Plaintiff gives five reasons why "res judicata" should not apply: (1) Plaintiff claims he had legitimate reasons for filing separate lawsuits; (2) Plaintiff claims that the Court should balance the interests of both sides in deciding whether a judgment in one case bars another; (3) Plaintiff claims

Defendants acquiesced to the splitting of claims; (4) Plaintiff claims that Judge Graham's decision should not be given preclusive effects because the prior lawsuit was decided against only Jakeway in his official (and not individual) capacity; and (5) Plaintiff claims that issue preclusion should not be used by this Court because the issues in this case are not identical to those as found in Judge Graham's decision. In addition to his "res judicata" arguments, Plaintiff claims that he has a valid First Amendment claim. Finally, Plaintiff argues that Defendants are not entitled to qualified immunity. As with Defendants, in his memorandum contra, Plaintiff spends a majority of his brief (over 98 pages) dealing with the "factual" events surrounding his tenure at ODOD.[2]

Because the Court finds that Plaintiff's claim is barred under the doctrine of claim preclusion, the Court will examine only Defendants' "res judicata" defense and Plaintiff's reasons for rejecting that defense.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute. It may be rendered only when appropriate evidentiary material, as described in Rule 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law. *See Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The moving party bears the burden of demonstrating that no material facts are in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Additionally, the Court must draw all reasonable inferences from that evidence in favor of the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is with these standards in mind that the instant motion must be decided.

### B. "Res Judicata"—Claim Preclusion

Defendants argue that this suit should be barred under the doctrine of res judicata. Specifically, Defendants argue that this case and *Wilkins ex rel. United States v. Ohio,* No. C–2–94–720, slip op. (S.D. Ohio filed Feb. 4, 1997), involve the same transaction or series of transactions. Defendants thus claim that the two cases present a single "cause of action" for "res judicata" purposes. (Doc. # 34 at 13.)

In discussing "res judicata," the Supreme Court noted that:

[t]he preclusive effects of former adjudication are discussed in varying and, at times, seemingly conflicting terminology, attributable to the evolution of preclusion concepts over the years. These effects are referred to collectively by most commentators as the doctrine of "res judicata." Res judicata is often analyzed further to consist of two preclusion concepts: "issue preclusion" and "claim preclusion." Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided. This effect also is referred to as direct or collateral estoppel. Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit. Claim preclusion therefore encompasses the law of merger and bar.

---

**2.** For future reference, the Court notes that both parties, in one form or another, failed to comply with the Local Rules for the Southern District of Ohio with respect to each of their briefs. *See* S.D. Ohio L.R. 7.2(a)(3). Although the Court is grateful that each party included a table of contents that was fairly descriptive, neither party really included "an abbreviated introductory *summary* of all points raised and of the primary authorities relied upon in the memorandum," as required by Local Rules. *Id.* (emphasis added).

*Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). The Sixth Circuit also noted its preference for using the term "claim preclusion" in cases such as this one. *See Barnes v. McDowell*, 848 F.2d 725, 728 n. 5 (6th Cir.1988). Thus, the Court will address Defendants' claims that this suit is barred under the doctrine of claim preclusion.

The purpose behind the doctrine of claim preclusion is that the "full and fair opportunity to litigate protects [a party's] adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *see also United States v. Stauffer Chem. Co.*, 684 F.2d 1174, 1180 (6th Cir.1982), *aff'd* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984).

■ Under the Sixth Circuit's articulation of claim preclusion, a claim will be barred by prior litigation if all of the following four elements are present: (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their "privies"; (3) an issue in the subsequent action which should have been litigated in the prior action; and (4) an identity of the causes of action. *See Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 880 (6th Cir.1997); *Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir.1995), *cert. denied*, 116 S.Ct. 1848 (1996).[3] In this case, Plaintiff contests all four elements of the test. The Court will examine all four elements in turn.

#### 1. Element One—Final Decision on the Merits

■ Under Section 13 of the Restatement (Second) of Judgments, "final judgment" in-

cludes "any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." Restatement (Second) of Judgments § 13 (1982). In this case, when Judge Graham granted Defendants' motion for summary judgment in *Wilkins ex rel. United States*, No. C–2–94–720, slip op. (S.D. Ohio filed Feb. 4, 1997) and dismissed Plaintiff's complaint in that action in its entirety with prejudice, there was a final decision on the merits for claim preclusion purposes. *See Mayer v. Distel Tool & Mach. Co.*, 556 F.2d 798, 798 (6th Cir.1977); *see also* Restatement (Second) of Judgments § 19 cmt. g (1982).

On the other hand, Plaintiff alleges that Judge Graham's decision was not made on the merits but rather made on grounds that the Court lacked jurisdiction over Plaintiff's claims. Thus, Plaintiff argues Judge Graham's decision dismissing the individual defendants cannot be afforded preclusive effect.

As Defendants point out, however, Judge Graham noted that Plaintiff's claims against Jakeway (in his individual capacity only), Lombardi and Garber did not allege facts sufficient to hold them liable under Plaintiff's "whistleblower" claim. *See Wilkins ex rel. United States*, No. C–2–94–720, slip op. at 12–13 (S.D. Ohio filed Sept. 11, 1995). Further, Judge Graham specifically noted that, "The court finds that plaintiff's complaint fails to state a claim against the individual defendants [including Jakeway, Lombardi and Garber] under [Plaintiff's "whistleblower" claim], and defendants' motion to dismiss is granted in that regard." *Id.* at 13. From this language, Judge Graham clearly did not dismiss Plaintiff's claim for lack of jurisdiction but decided Plaintiff's claim on its merits.

Furthermore, although Judge Graham decided to dismiss Plaintiff's cause of action

---

**3.** The Sixth Circuit also adopted the Restatement (Second) of Judgments approach to the doctrine of claim preclusion. *See J.Z.G. Resources, Inc. v. Shelby Ins. Co.*, 84 F.3d 211, 215 (6th Cir.1996). The Restatement approach holds that a valid and final judgment rendered in an action extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transac-

tions, out of which the action arose." *Id.* (quoting Restatement (Second) of Judgments § 24 (1982)). Because the Sixth Circuit uses its four-part test more frequently (and most recently), the Court will examine Defendants' claim preclusion argument under the four-part test. The Court notes, however, that the result would remain the same under the Restatement (Second) test.

against Lombardi and Garber before the final decision on the merits, that decision did not become a final judgment until the entire case was dismissed. Plaintiff was free to revisit Judge Graham's decision. Therefore, Plaintiff's argument is without merit. Judge Graham's final order is a final judgment on the merits for claim preclusion purposes.

### 2. Element Two—Involving the Same Parties or Their Privies

The second element of claim preclusion requires an identity of parties. Plaintiff contests this element because of the capacity in which Plaintiff sued some of the Defendants. In his initial complaint and first Amended Complaint in *Wilkins ex rel. United States,* Plaintiff failed to list the capacities in which he sued the defendants. However, in his Second Amended Complaint in *Wilkins ex rel. United States,* No. C–2–94–720 (S.D. Ohio filed Mar. 1, 1995), Plaintiff sued Jakeway, Lombardi and Garber in both their individual and official capacities. On September 11, 1995, Judge Graham dismissed Plaintiff's "whistleblower" claims against Jakeway (in his individual capacity only), Lombardi and Garber. Thus, in *Wilkins ex rel. United States,* at one point in the lawsuit, claims were pending against Jakeway, Lombardi and Garber in their individual and official capacities.

In this case, Plaintiff sued these three defendants in their individual and official capacities. (Doc. # 10 at ¶¶ 3, 4 and 5.) Thus, the same parties were represented in both lawsuits and there is an identity of parties between the two lawsuits. Consequently, Defendants have established the second element of claim preclusion. *Cf. Richards v. Jefferson County,* 517 U.S. 793, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996); *Martin v. Wilks,* 490 U.S. 755, 761, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989); *American Postal Workers Union Columbus Area Local AFL–CIO v. United States Postal Serv.,* 736 F.2d 317, 318 (6th Cir.1984).

### 3. Element Three—Involving Issues Actually Litigated or Those Which Should Have Been Litigated

■ The third requirement of claim preclusion "prohibits parties from bringing claims they have already brought or should have brought." *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.,* 973 F.2d 474, 482 (6th Cir.1992). In this case, Defendants claim that Plaintiff should have brought his cause of action for wrongful termination in violation of § 1983 and the First and Fourteenth Amendments when he brought his claim for wrongful termination in violation of the "whistleblower" portion of the False Claims Act. Usually, a judgment in a prior action will preclude another action based on the same facts and asserted injury even though the subsequent action asserts a different legal theory to justify recovery. *See* 18 James Wm. Moore et al., *Moore's Federal Practice* § 131.31[3][a] (3d ed.1997). *See also Nevada v. United States,* 463 U.S. 110, 129–30, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983)("The final 'judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties on any ground whatsoever.'" (quoting *Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 92 L.Ed. 898 (1948))).

■ In this case, the Court finds that the two causes of action for wrongful termination in violation of the "whistleblower" portion of the False Claims Act and for wrongful termination in violation of § 1983 and the First and Fourteenth Amendments should have been brought in the same suit. Although Plaintiff's False Claim Act "whistleblower" claim had to be brought against Plaintiff's employer under that statute, his cause of action is essentially the same as the one he brought in this case. Specifically, both cases involved Plaintiff's ultimate termination for reporting problems regarding violations of state and federal laws and policies with respect to the misuse of state and federal funds. *Compare* (Doc. # 10) *with Wilkins ex rel. United States,* No. C–2–94–720, Pl.'s Second Am. Compl. (S.D. Ohio filed Mar. 1, 1995). Consequently, the Court finds that Defendants have met the third requirement for claim preclusion.

### 4. Element Four—Identity of Causes of Action

■ The fourth element of claim preclusion involves an identity of causes of action.

For claim preclusion purposes, there will be an identity of causes of action where there is "an identity of the facts creating the right of action and of the evidence necessary to sustain each action." *Sanders,* 973 F.2d at 484 (quoting *Westwood Chem. Co. v. Kulick,* 656 F.2d 1224, 1227 (6th Cir.1981)). The Sixth Circuit also has stated that the identity of causes of action element is determined "by considering whether the claims arose out of the same transaction or series of transactions, or whether the claims arose out of the same core of operative facts." *In re Micro-Time Mgt. Sys., Inc.,* Nos. 91–2260 and 91–2261, 1993 WL 7524, at *5 (6th Cir. Jan.12, 1993)(citing *In re Justice Oaks II, Ltd.,* 898 F.2d 1544, 1551–52 (11th Cir.1990)).

■ The Restatement (Second) of Judgments gives a guideline for the Court in determining what constitutes a "transaction" or a "series of transactions." *See* Restatement (Second) of Judgments § 24(2). The Restatement notes that the terms are "to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Id.* As the commentary to § 24 illustrates,

> the expression ["transaction, or series of connected transactions"] connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should be held precluded.

*Id.,* cmt. b. Thus, the Court must determine whether the two cases together form a natural grouping or are the cases so related that they form a convenient trial unit. At the same time, however, the Court will attempt to use the *Sanders* model that requires the Court to examine if an identity of facts creating the right of action is present in the two cases.

In this case, the Court finds that the two cases involve the same transaction or series of transactions. In his Second Amended Complaint in *Wilkins ex rel. United States,* Plaintiff brings a cause of action—in addition to his other causes of action relating to other aspects of the False Claims Act—for essentially a wrongful termination. *See Wilkins ex rel. United States,* No. C–2–94–720, Pl.'s Second Am. Compl. (S.D. Ohio filed March 1, 1995). Plaintiff's Second Amended Complaint alleges that he was

> harassed, threatened, discriminated against in the terms and conditions of employment and terminated from his position at the Ohio Department of Development [] because he acted in furtherance of the False Claims Act by investigating, uncovering and reporting the violations of state and Federal regulations and law and the misuse of Federal funds to the defendants [namely, the State of Ohio, the ODOD, Donald Jakeway, Vincent Lombardi, Roberta Garber and Melanie Buller] and their agents, and the Ohio Inspector General.

*Id.* at ¶ 55. In other words, Plaintiff was terminated for his alleged investigation into the wrongdoing and violation of state and Federal regulations and the misuse of Federal funds.

Similarly, Plaintiff's Amended Complaint in this case alleges that Defendants (and their employees and agents) acted "individually and in conspiracy with other defendants to discipline plaintiff and then to terminate him because of his having reported to his supervisors and the Ohio Inspector General violations of law and policies by community action agencies and state employees' involvement in and knowledge of such violations." (Doc. # 10 at ¶ 14.) Further, Plaintiff's Amended Complaint in this case alleges that Defendants "were aware that plaintiff had reported the misuse of public funds to his supervisors and the Ohio Inspector General. Based on information and belief, the defen-

dants were upset by the reports and acted to get rid of the plaintiff in order to silence him and his public spirited [sic] communications." (*Id.* at ¶ 13.)

From a clear reading of both complaints, the Court finds that the two complaints are so interrelated that they should have been tried at the same time. In this case, Plaintiff would have presented evidence that he reported a misuse of public funds. Plaintiff would also give testimony that he was disciplined for reporting violations of laws to the Ohio Inspector General and his supervisors. In *Wilkins ex rel. United States,* Plaintiff gave testimony that he had reported a misuse of funds and that he was disciplined for reporting violations of laws to his supervisors and to the Ohio Inspector General. Furthermore, the two cases would have involved the same witnesses testifying about the same incidents.

In his opinion in *Wilkins ex rel. United States,* Judge Graham devotes over fifteen pages to the "events leading to Plaintiff's termination." *See Wilkins ex rel. United States,* No. C–2–94–720, slip op. at 57–72 (S.D. Ohio filed Feb. 4, 1997). In describing those events, Judge Graham characterized Plaintiff's cause of action as containing allegations "that [Plaintiff] was harassed, threatened, discriminated against and terminated from his position as chief of OCS because he investigated, uncovered and reported violations of federal regulations and the misuse of federal funds to the defendants and to the Ohio [I]nspector [G]eneral." *Id.* at 57. In his opinion, Judge Graham recounted Plaintiff's work history from 1988 through his firing.[4] Judge Graham also detailed Plaintiff's disagreement with his supervisors and his various problems at work.

After reviewing Judge Graham's analysis, the Court finds that the Court would be required to revisit these very issues already decided by Judge Graham had this case gone to trial on the merits. The same facts necessary to prove Plaintiff's "whistleblower" claim would also be necessary to prove Plaintiff's claim for § 1983 violation and his First

and Fourteenth Amendment claims. Thus, an identity of facts creating the right of action is present in both cases.

Consequently, the Court finds that all four elements of claim preclusion are present in this case. The Court, however, recognizes that there are exceptions to the doctrine of claim preclusion and will examine Plaintiff's reasons for not applying the doctrine to determine whether Plaintiff's claim should be barred.

### C. Plaintiff's Reasons Not to Apply Claim Preclusion

Plaintiff raises five reasons not to apply to claim preclusion. First, Plaintiff claims that he had legitimate reasons for filing separate lawsuits. Second, Plaintiff claims that the Court must balance the interests of both sides in deciding whether a judgment in one case bars another. Third, Plaintiff claims that Defendants have acquiesced to his claim splitting. Fourth, Plaintiff claims that Judge Graham's decision should not be given preclusive effects because the prior lawsuit was decided against only Jakeway in his official (and not individual) capacity. Plaintiff's "defense" is similar to the argument that the second element of claim preclusion does not apply because there is no identity of parties between the two lawsuits. Fifth and last, Plaintiff claims that issue preclusion, a doctrine related to claim preclusion, should not be used by this Court because the issues in this case are not identical to those as found in Judge Graham's decision. The Court will examine each reason seriatim.

### 1. Legitimate Reasons for Two Lawsuits

■ Plaintiff claims that he had legitimate reasons for bringing two lawsuits. However, Plaintiff does not dispute that he *could* have brought all his claims in the same lawsuit; instead, Plaintiff contends that bringing two suits was much easier and that if he would have filed a single lawsuit, the delays and possible interlocutory appeals would have crippled his ability to present a claim. Nev-

---

**4.** The Court attempted to summarize Judge Graham's findings in the factual section of this Opinion and Order. *See* section I., *supra.*

ertheless, the Court finds that it is possible to bring a False Claims Act *qui tam* lawsuit and include a cause of action for § 1983 and First Amendment violations in the same lawsuit. *Cf. Clemes v. Del Norte County Unified Sch. Dist.*, 843 F.Supp. 583, 585 (N.D.Cal.1994); [5] *Minotti v. Wheaton*, 630 F.Supp. 280, 284–85 (D.Conn.1986) (§ 1983 claim dismissed, however, for failure to state a cause of action); *Gutierrez v. NASA*, No. C–96–20061–JW (EAI), 1996 WL 341034 (N.D.Cal. June 13, 1996)(complaint dismissed for lack of subject matter jurisdiction over NLRA claim and failure to bring cause of action against state actor). Given the policies underlying the doctrine of claim preclusion, the fact that Plaintiff could have brought all his claims in one action demonstrates that he should have done so. Plaintiff's own convenience in engaging in piecemeal litigation does not override the policies of claim preclusion and justify splitting his claims. Consequently, the Court will not accept Plaintiff's justification that as a matter of convenience he brought his causes of action in two separate lawsuits.

### 2. Balancing the Interests

Plaintiff's next argument is an equitable argument that claim preclusion should not be used in this case. Specifically, Plaintiff notes that, "Defendants act as if the doctrine of *res judicata* is inflexible and applies no matter what the circumstances are. Defendants are wrong." (Doc. # 37 at 15.)

■ Claim preclusion has dramatic effects. In *Brown v. Felson*, 442 U.S. 127, 132, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), the Supreme Court cautioned courts from applying the doctrine too readily:

> Because res judicata may govern grounds and defenses not previously litigated ... it blockades unexplored paths that may lead to truth. For the sake of repose, res judicata shields the fraud and the cheat as well as the honest person. It is therefore to be invoked only after careful inquiry.

*Id.* As *Moore's Federal Practice* notes, the Supreme Court's "admonition for 'careful in-

quiry' before application of the claim preclusion does not, however, imply that the lower courts have discretion in its application. There is no general equitable principle that will permit a court to refuse application of the claim preclusion doctrine on the grounds of unfairness or injustice to a party." 18 *Moore's Federal Practice, supra,* at § 131.24[6] (citing *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 395–98, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981)). Further, the Supreme Court stated that "public policy dictates that there be an end to litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." *Moitie*, 452 U.S. at 401. Thus, the Court has no discretion under equity principals in this matter.

■ Even if the Court had equitable discretion, the Court finds that equity does not favor Plaintiff. Although the Court finds that bringing two separate lawsuits may have been easier for Plaintiff and allowed Plaintiff to go forward with research and discovery while the *qui tam* action remained under seal, as noted above, Plaintiff *could* have brought his claims in the same lawsuit. Further, he could have amended his pleadings and consolidated his claims when the *qui tam* suit was no longer under seal. This legal strategy would have avoided Plaintiff's fears about the need for the duplication of discovery and fact resolution. (Doc. # 37 at 11.)

In addition, Plaintiff claims that had he tried this strategy, Defendants would have been able to appeal a motion to dismiss based upon the denial of qualified immunity. Although this scenario is possible, the Court finds that is too hypothetical to be a valid consideration. The need for judicial economy outweighs Plaintiff's hypothetical scenarios. Plaintiff should have consolidated his claims so that one court (and not two separate courts) would have had an opportunity to review Plaintiff's claims.

---

5. Different orders from this case are also available as *Clemes v. Del Norte County Unified Sch. Dist.*, No. C–93–1912 MHP (ENE), 1994 WL 317546, at *1 (N.D.Cal. June 21, 1994); *Id.*, 1995 WL 573691, at *1 (N.D.Cal. Sept.19, 1995); *Id.*, 1996 WL 331096, at *1 (N.D.Cal. May 28, 1996).

Next, Plaintiff claims that the purposes of the False Claims Act would have been frustrated if Plaintiff were required to file all claims in one suit. Once again, Plaintiff indicates that the need for discovery weighs in his favor. Further, Plaintiff claims that splitting his claims actually benefitted Defendants because they "were able to prevent plaintiff from conducting any discovery on facts relating to the termination for over a year after this case was filed." (Doc. # 37 at 22–23.) Plaintiff also claims that Defendants have benefitted because they did not have to duplicate discovery. Plaintiff concludes his argument by noting that if the False Claims Act judgment is preclusive, "plaintiff would be harmed to an incalculable extent. Plaintiff would be forever barred from asserting his important First Amendment claim." (*Id.* at 23.)

Plaintiff's reasoning duplicates his equity arguments. In addition, Plaintiff's argument about Defendants benefitting from Plaintiff's decision to split his claims attempts to avoid the problems of claim splitting. Normally, when a plaintiff splits her claims, the parties would need to duplicate discovery. Just because this case avoids the problem of duplicate discovery does not mean that Plaintiff should be allowed to split his claim. Indeed, by splitting his claim, Plaintiff has wasted valuable judicial resources that may have been better spent deciding other matters. Plaintiff has asked two courts to hear the same allegations: once in a "massive *qui tam* False Claims Act case" and a second time in a First Amendment case. (Doc. # 37 at 8.) By splitting his claims, Plaintiff gambled that at least one of two courts would find in his favor on two actions arising out of the same facts.

Thus, the Court will not use equity to avoid claim preclusion. *Cf. Moitie,* 452 U.S. at 401. Consequently, Plaintiff's second reason for avoiding claim preclusion fails.

### 3. Acquiescence

Third, Plaintiff raises the idea of waiver to the application of claim preclusion. Section 26(1)(a) of the Restatement (Second) of Judgments states that claim preclusion does not apply as the basis for barring a second action

where the defendant "has acquiesced therein." Restatement (Second) of Judgments § 26(1)(a) (1982). Comment a to this section notes that a "main purpose of the general rule [of claim preclusion] is to protect the defendant from being harassed by repetitive actions based on the same claim. This rule is thus not applicable where the defendant consents, in express words or otherwise, to the splitting of the claim." *Id.,* cmt. a. Furthermore, the commentary notes that:

> Where the plaintiff is simultaneously maintaining separate actions based upon parts of the same claim, and in *neither* action does the defendant make the objection that another action is pending based on the same claim, judgment in one of the actions does not preclude the plaintiff from proceeding and obtaining judgment in the other action. The failure of the defendant to object to the splitting of the plaintiff's claim is effective as an acquiescence in the splitting of the claim.

*Id.* (emphasis added). Thus, where a defendant allows two simultaneous actions based upon the same claim to go forward, a defendant waives the defense of claim preclusion unless that defendant objects in either of the two actions.

Section 26(1)(a) has not been expressly adopted by the Sixth Circuit. Nevertheless, other courts have approved of the doctrine of waiver to claim preclusion. *See Clements v. Airport Auth.,* 69 F.3d 321, 328 (9th Cir.1995); *Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1072–73 (3d Cir.1990)(defendant acquiesced to reservation of federal claim in state proceedings by failing to object); *Kern Oil & Ref. Co. v. Tenneco Oil Co.,* 840 F.2d 730, 735 (9th Cir.1988)(defendant could not object to claims being split where both actions had been pending in federal court without objection from defendant and defendant first raised claim-preclusion objection after judgment in one case); *Calderon Rosado v. General Elec. Circuit Breakers, Inc.,* 805 F.2d 1085, 1087 (1st Cir.1986). *See also* 18 *Moore's Federal Practice, supra,* at § 131.24[1] ("Acquiescence ... occurs when a defendant allows two simultaneous actions on the same claim to proceed without objec-

tion."). Thus, the Court finds that where a defendant acquiesces in a splitting of claims by a plaintiff, claim preclusion is inapplicable.

■ Further, courts have recognized that an objection to claim splitting must be raised early in the proceedings. "It is [] universally recognized that a defendant asked to defend two lawsuits alleging the same cause of action waives the right to object to the litigation of both actions if he or she does not protest at the earliest possible time." *North Carolina Elec. Membership Corp. v. White*, 722 F.Supp. 1314, 1321 (D.S.C.1989) (citing *Southern Stock Fire Ins. Co. v. Raleigh, Charlotte & S. Ry.*, 179 N.C. 290, 102 S.E. 504, 505 (1920) and *Diversified Mortgage Investors v. Viking Gen. Corp.*, 16 Mass.App. Ct. 142, 450 N.E.2d 176 (1983)).

■ In this case, the Court finds that Defendants have not acquiesced to the splitting of Plaintiff's claims. In Defendants' Answer to Plaintiff's Second Amended Complaint in *Wilkins ex rel. United States*, Defendants raised the defense of "res judicata." [6] *See Wilkins ex rel. United States*, No. C–2–94–720, Defs.' Answer to Pl.'s Second Am. Compl. (S.D. Ohio filed Jan. 19, 1996). Defendants' answer was the first and only answer filed in *Wilkins ex rel. United States* because of the procedural posture of that case. Thus, Defendants raised the defense of res judicata at the earliest possible time and put Plaintiff on notice that he should either move to consolidate or amend his pleadings in order to avoid the potential of res judicata.

Furthermore, Defendants submitted a copy of a joint motion to extend the discovery deadline and to vacate the trial date in *Wilkins ex rel. United States*. In that joint motion, filed on January 19, 1996, both parties stated:

> Plaintiff continues to oppose consolidation and therefore requests that this action be reset for trial at the earliest possible date consistent with giving the parties an[] opportunity to submit, and the Court to decide, a motion for summary judgment. Defendants believe there are serious *res judicata* and/or collateral estoppel difficul-

ties in plaintiffs' pursuing two separate claims involving the same transaction ([Plaintiff's] discharge). Defendants suggest that the case either not be reassigned for trial in the immediate future or be assigned for a date sufficiently far in advance that the Court will have the opportunity to see what comes back from the Sixth Circuit in *Wilkins v. Jakeway, et al.*, and to decide whether to require Wilkins to choose between his causes of action or consolidate his claims into one lawsuit.

(Doc. # 34 Ex. C.) From this joint motion, Plaintiff concedes that he "continues to oppose consolidation." This phrase suggests that Plaintiff was aware of the possible effects of splitting his claim. Plaintiff should have been on notice of the possibility of claim preclusion; Plaintiff should have also been on notice that a judgment in either this case or the *Wilkins ex rel. United States* case could bar Plaintiff's claim in the other case. Therefore, the Court finds that Defendants did not acquiesce to Plaintiff's claim splitting and put Plaintiff on notice at the earliest possible time that Defendants opposed Plaintiff's tactic of trying two cases in the same forum. Plaintiff's reason not to apply claim splitting is without merit.

**4. Capacities of the Parties**

Plaintiff's fourth reason not to apply claim preclusion addresses the capacity of the parties to the two lawsuits. The Court addressed this defense when discussing the second element of claim preclusion. As noted above, the Court finds that privity of parties exists. At one point during *Wilkins ex rel. United States*, Plaintiff sued the same Defendants in this case in both their official and individual capacity. Moreover, although Judge Graham dismissed claims against all but Jakeway (in his official capacity), no final decision on the merits was reached until Judge Graham's final order. Plaintiff was free to file a motion for reconsideration or a motion to consolidate long before Judge Graham rendered his final decision on February 4, 1997.

---

**6.** The Court construes this statement as raising the defense of claim preclusion.

### 5. Issue Preclusion

Because the Court finds that Plaintiff's claim is barred by claim preclusion, this fifth and final reason is inapplicable to the case at bar. Therefore, Plaintiff's argument that issue preclusion should not apply is without merit.

### III. CONCLUSION

Upon consideration and being duly advised, the Court finds that Plaintiff's claims are barred by the doctrine of claim preclusion. The final judgment in *Wilkins ex rel. United States v. Ohio,* No. C-2-94-720, slip op. (S.D. Ohio filed Feb. 4, 1997), has preclusive effect over Plaintiff's current claims.

In *Wilkins ex rel. United States,* Judge Graham heard evidence concerning Plaintiff's claims that he was terminated for "whistle-blowing" after being harassed, threatened and discriminated against in the terms and conditions of employment in his position at ODOD because he acted to investigate, uncover and report the violations of state and federal regulations and law and the misuse of federal funds to Defendants and the Ohio Inspector General. *See id.* In this case, Plaintiff's claims concern the same events surrounding the misuse of state and federal funds and the violations of state and federal law and policies and his termination for allegedly reporting these same problems.

The Court finds that in *Wilkins ex rel. United States* a final decision was rendered on the merits by a court of competent jurisdiction, that this action involved the same parties, that this action raises issues that should have been litigated in *Wilkins ex rel. United States,* and that there is an identity of the causes of action in these two lawsuits. *See Sanders,* 973 F.2d at 480. Thus, a final judgment on the merits of *Wilkins ex rel. United States* precludes Plaintiff from relitigating claims that could have been raised in that action. *See Moitie,* 452 U.S. at 398.

Finally, Plaintiff's "defenses" to claim preclusion do not prevent *Wilkins ex rel. United States* from barring this action. Plaintiff's best argument in favor of being able to go forward in this case—acquiescence—fails. Defendants raised the issue of claim preclusion at a point in time that gave Plaintiff the opportunity to amend his pleadings or consolidate his cases so that all his causes of actions could have been brought in the same lawsuit. Instead, Plaintiff chose to go forward with separate claims and now will be barred from bringing his claims under a First Amendment theory. In addition, Plaintiff's arguments using equity fail to persuade this Court in light of the Supreme Court's directive in *Moitie,* 452 U.S. at 401.

Consequently, the Court finds that summary judgment is appropriate in this case because no genuine issue of material fact remains for trial. The Court **GRANTS** Defendants' motion for summary judgment and judgment is rendered for Defendants and against Plaintiff. This case is **TERMINATED WITH PREJUDICE.**

**IT IS SO ORDERED.**