2008-NMCA-042

182 P.3d 794

**CONCERNED RESIDENTS OF SANTA FE NORTH, INC., Plaintiff–Appellee/Cross–Appellant,**

v.

**SANTA FE ESTATES, INC., Defendant–Appellant/Cross–Appellee,**

and

**The City of Santa Fe and Thornburg Companies, Defendants.**

No. 26,428.

Court of Appeals of New Mexico.

Feb. 6, 2008.

VanAmberg, Rogers, Yepa & Abeita, LLP, Ronald J. VanAmberg, Santa Fe, NM, for Appellee.

Holland & Hart LLP, Mark F. Sheridan, Kristina Martinez, Santa Fe, NM, for Appellant.

## OPINION

SUTIN, Chief Judge.

{1} The parties in this real estate development dispute are Concerned Residents of Santa Fe North, Inc. (Residents), Santa Fe Estates, Inc. (Estates), the City of Santa Fe (the City), and Thornburg Companies (Thornburg).

## OVERVIEW

{2} A 1996 settlement agreement resolved an action filed in 1996 (the 1996 action) by Residents against the City and Estates to resolve issues relating to a 1995 master plan and relating to Estates' property. When the City Council ratified a 1996 master plan incorporating elements of the settlement agreement, Residents stipulated to a dismissal of the 1996 action.

{3} In 2003 Thornburg, under contract with Estates to purchase and develop Estates' property for an office complex, filed an application for the development of a proposed commercial area of Estates' property (the Thornburg plan). The Thornburg plan was reviewed and approved by the City Planning Commission. Residents, who opposed the Thornburg plan, appealed this decision of the Planning Commission to the City Council, and in early 2004 the City Council approved the Thornburg plan. Asserting that the Thornburg plan and the City's approval of the plan violated the settlement agreement and the 1996 master plan, Residents in early 2004 filed a district court action against Thornburg, Estates, and the City (collectively, Defendants) alleging breach of the settlement agreement and seeking declaratory and injunctive relief. We will refer to this action as "the contract action."

{4} Also in early 2004, soon after filing the contract action, Residents filed four additional district court actions, each an administrative appeal filed pursuant to Rule 1–074 NMRA, to overturn unfavorable decisions of the City Planning Commission and the City Council. The district court judge who heard and decided the contract action was not the same judge who entered the final order deciding the administrative appeals. The four administrative appeals were consolidated, after which, on October 18, 2004, in a memorandum opinion, and on November 3, 2004, in a final order and judgment, the court resolved the appeals and affirmed the City Planning Commission's decision favoring the Thornburg plan. We will refer to these consolidated administrative appeals as "the administrative appeals."

{5} Defendants in the contract action filed motions for summary judgment in April 2005. The district court dismissed Residents' claims against the City and Thornburg on grounds not pertinent to the appeals now before this Court. The court denied Estates' summary judgment motions, which were based on res judicata and contract interpretation.

{6} Afterwards, the contract action was tried. Among other determinations in its final judgment, the district court held that certain design and development restrictions in the parties' settlement agreement created enforceable contractual rights or restrictions in favor of Residents regarding the commercial property. The court also declared that Residents had a "right to enforce the creation and recordation of the restrictive covenants against [Estates'] Commercial Property." In addition, the court denied Estates' affirmative defense of res judicata. It is

from this final judgment that Estates appeals and Residents cross-appeals. We affirm.

## BACKGROUND

{7} In connection with the 1996 action, the City, Estates, and Residents engaged in negotiations as to changes to be made in the 1995 master plan. As part of the negotiations, on June 10, 1996, Residents' attorney, Michael Gross, wrote to the City's attorney summarizing the major points Residents sought in a possible settlement of the 1996 action in regard to the commercial property owned by Estates. The letter stated, among other things, "[Residents] also requests that the master plan specify the types of businesses, uses, hours of operation, signing and lighting that are to be permitted so that they will be limited and of low-impact." The City's staff thereafter indicated their proposed changes in a document dated July 17, 1996, which referred to and discussed "neighborhood commercial use tracts." The parties refer to these proposed changes as the City's master plan conditions.

{8} On July 18, 1996, Gross wrote to the attorneys for the City and Estates stating major concerns. Gross pointed out that the commercial area was to be "four acres or less and ... encompass uses which are appropriate for the area and in keeping with present City ordinances." In his September 5, 1996, letter, Estates' representative Bruce Geiss referred to various meetings of the interested parties that had occurred, addressed Residents' concerns and the City's master plan conditions relating to the commercial area, and identified the changes in the 1995 master plan that Estates was willing to accept (the Geiss letter). Among Residents' issues that Geiss addressed were "Use and Design Restrictions on the Commercial Area." Attached to the Geiss letter was a "Vision Statement" developed by Estates at Residents' request, which proposed specific use and design concepts for the commercial area, and which, Estates stated, "shall serve as the basis for the ultimate design of the commercial area."

{9} The vision statement stated Estates' intent "to provide an economically viable, socially lively, pedestrian based commercial district." Estates "visualized ... a small scale, neighborhood commercial district, with design covenants dictating buildings which are compatible with nearby residential structures and limited to two story heights," in which "[l]arge scale retail users, such as Wal–Mart, Price Club and Smith's Superstores, will not be permitted." The statement also established that "[d]esign standards and covenants will limit commercial development to the New–Old Santa Fe Pueblo or Spanish style of architecture." Further, it stated that "[d]esign covenants will also limit signage to similar styles and all lighting shall be shielded and spill controlled." Interspersed throughout the vision statement were several less specific uses and designs that Estates "anticipated" for the commercial area. Finally, the vision statement concluded with the statement that "[t]he actual development plan for the Village Center will be submitted to a review process that will require approval of the Santa Fe Planning Commission which provides for public review and comments by all interested parties."

{10} A September 10, 1996, letter from Gross to Estates' attorney and the City's attorney (the Gross letter) stated that, with certain changes and clarifications, the Geiss letter, which modified the City's master plan conditions, was "accepted by each of the parties." The Gross letter attached the City's master plan conditions and the Geiss letter, incorporating these documents as part of the settlement agreement. The Geiss and Gross letters and attached documents formed the parties' settlement agreement. The City approved the settlement agreement and adopted the 1996 master plan, which amended and modified the 1995 master plan. Based on the settlement agreement, which included the vision statement, the parties stipulated to the dismissal of the 1996 action.

{11} In 2003 Thornburg presented the Thornburg plan to the City Planning Commission for approval. The City administrative proceedings resulted in approval by the City of the Thornburg plan. In early 2004, Residents filed its contract action first, followed by its administrative appeals to the district court. The thrust of both the administrative appeals and the contract action was to defeat the Thornburg plan because, ac-

cording to Residents, the plan violated the settlement agreement in that it lacked use and design restrictions that were required pursuant to the settlement agreement. The district court which entertained the administrative appeals decided the appeals against Residents and affirmed the City's approval of the Thornburg plan. Residents did not appeal from this unfavorable judgment. The district court handling the contract action denied Estates' motions for summary judgment (res judicata and contract interpretation) and after a bench trial decided the issues, for the most part, in favor of Residents.

{12} In the contract action, the district court's conclusions of law established enforceable contractual rights and restrictions in favor of Residents. The court based its conclusions on its finding that the settlement agreement was ambiguous and its interpretation of that ambiguity such that the settlement agreement created enforceable contract rights with "binding and continuing restrictions upon the future development" of the commercial property. These restrictions included restrictions on building height, exclusion of large scale retail users, limitations on the style of architecture for buildings and signage, and a requirement for shielded and spill-controlled lighting. In addition, the court found that the foregoing four restrictions "must be placed as permanent restrictions" by Estates as soon as legal lots or parcels of record are established.

{13} In its conclusions of law, the court reiterated the four "binding and continuing restrictions upon the future development" that it enumerated in its findings of fact number 25. In addition, the court stated that Estates' "continuing contractual obligation to create and record the restrictions against the Commercial Property ... are enforceable obligations under the [settlement agreement]." In its final judgment in the contract action, the district court first stated that "[c]ertain design and development restrictions within the Vision Statement ... created enforceable contractual rights or restrictions in favor of [Residents]." The judgment then repeated the same four specific contractual rights and restrictions regarding

the commercial property that were set out in its findings and conclusions of law. Referring to the four contractual rights and restrictions, the judgment stated, these "rights and restrictions ... must become restrictive covenants upon the ... Commercial Property, binding upon the heirs, successors and assigns of [Estates]."

{14} In its judgment, the court also referred to these restrictive covenants as "permanent restrictive covenants" to be placed by Estates "as soon as legal lots or parcels of record are established for the Commercial Property and prior to any transfer of the Commercial Property to any purchaser or owner of the Commercial Property as it may be severed from the remaining larger parcel of property identified in the 1996 Master Plan." The court granted Residents a declaratory judgment which recognized Residents' "continuing right to enforce the 1996 Settlement Agreement obligations of [Estates]," that is, its "right to enforce the creation and recordation of the restrictive covenants against the Commercial Property" that the court set out in the judgment "once legal lots or parcels of record for the Commercial Property have been established, subject to any enforcement rights which might be established under Paragraph 8" of the judgment. The court stated that Estates' obligations were "continuing in nature" and that "[t]he time for creating and recording the restrictive covenants is prior to any sale or transfer of the Commercial Property or portion thereof by [Estates]." Paragraph 8 of the judgment stated, "In entering this judgment, the Court has determined that it is premature at this time and has not ruled whether [Residents] has any rights to enforce the restrictive covenants that [Estates] is required to create and record hereunder." The judgment denied Estates' res judicata defense.

{15} Estates appeals the adverse determinations in the contract action and asserts: (1) the district court erred in denying its motion for summary judgment on res judicata grounds, in that the final disposition in favor of the Thornburg plan in the administrative appeals precluded the contract action; and (2) the district court erred in holding that the

settlement agreement created contractually enforceable restrictive covenants running with the land and imposed a duty on Estates to create and record restrictive covenants against the commercial area. Residents cross-appeals, faulting the district court for not confirming in Residents additional contract rights to enforce all use and design restrictions and covenants in the vision statement. We first address Estates' appeal and then Residents' cross-appeal.

## ESTATES' APPEAL

{16} Estates argues that the district court judgment in the administrative appeals precluded the contract action on res judicata grounds. Estates also argues that the district court erred in holding that the settlement agreement was ambiguous, and then finding, without substantial evidence, that the settlement agreement gave Residents enforceable contract rights, placed binding and continuing restrictions on future development, and required Estates to record restrictive covenants.

## I. Res Judicata and Acquiescence

### A. Res Judicata

{17} The res judicata doctrine is invoked to protect litigants from the burden of multiple litigation and to promote both judicial economy and the policy favoring reliance on final judgments by minimizing the possibility of inconsistent decisions. *Myers v. Olson,* 100 N.M. 745, 747, 676 P.2d 822, 824 (1984). "The purpose of res judicata is to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Chaara v. Lander,* 2002–NMCA–053, ¶ 10, 132 N.M. 175, 45 P.3d 895 (internal quotation marks and citation omitted). Because we hold, as discussed later in this opinion, that Estates' acquiescence bars its res judicata defense, we do not address Estates' res judicata arguments.

### B. Acquiescence

{18} Residents contended in the district court and contends on appeal that Estates' res judicata defense, which was generally asserted in Estates' answer as an affirmative defense, must fail because Estates either waived its objection to or acquiesced in Residents' alleged claim-splitting.

### 1. Standard of Review

{19} Estates maintains that on the issues of waiver and acquiescence our standard of review is de novo. Estates asserts that the facts are not in dispute, the only dispute is the legal significance of those facts, and this Court can and should review denial of its res judicata motion for summary judgment de novo, citing *Chaara,* 2002–NMCA–053, ¶ 23, 132 N.M. 175, 45 P.3d 895. *Chaara* stands for the propositions that where a summary judgment motion presents solely an issue of law, the issue is correctly not to be submitted to a fact finder, the denial of the motion is not merged into a verdict, and the issue is reviewable on appeal from a final judgment. *Id.* ¶¶ 22–23. This Court in *Chaara* reviewed the denial of the summary judgment motion de novo and determined that the district court erred as a matter of law in failing to grant the movant summary judgment on the ground that the plaintiff's action was precluded on res judicata grounds. *Id.* ¶¶ 10, 22–23.

{20} Residents maintains that waiver and acquiescence are issues of fact to be found by the district court and upheld if supported by substantial evidence, citing *Garcia v. Marquez,* 101 N.M. 427, 431, 684 P.2d 513, 517 (1984), which states that "[w]hether an affirmative defense of waiver has been proven is a factual question for the trial judge, the determination of which will not be disturbed if based on substantial evidence," and also citing *Romero v. Bank of the Southwest,* 2003–NMCA–124, ¶¶ 17–18, 135 N.M. 1, 83 P.3d 288. In *Romero,* this Court was faced with similar opposing positions on the applicable standard of review when we considered a district court's decision on the question of ratification. *Id.* ¶ 17. One party urged de novo review, "arguing that the district court misapplied the law of ratification to the undisputed facts." *Id.* The other party argued "that the question of ratification is a question of fact which should be reviewed for substantial evidence." *Id.* The district court found

that the agreement in question was not ratified. *Id.* We stated, "[w]e believe ratification is best reviewed as an issue of fact" and we reviewed the court's finding for substantial evidence. *Id.*

{21} In the present case, the district court denied Estates' res judicata (claim-splitting) summary judgment motion before the issues of contract interpretation were tried. After trial, in its conclusions of law, the court stated, without any reference to any particular defense, that "[a]ll other affirmative defenses asserted by either party herein are denied." The parties did not submit requested findings of fact and conclusions of law on the questions of res judicata or acquiescence. Nor did the court enter findings of fact or conclusions of law specifically in regard to res judicata or acquiescence.

{22} It appears from this record that the district court determined the validity of the defense of res judicata by considering undisputed facts set forth in the summary judgment proceeding and determining from those facts that Estates waived its res judicata defense by acquiescing in Residents' alleged claim-splitting. The facts, together with a waiver and acquiescence argument, were set out in Residents' answer brief in opposition to the res judicata motion. In a reply, Estates responded to Residents' waiver and acquiescence argument not by discussing facts or arguing the existence of factual issues, but by contending that *Cagan v. Village of Angel Fire*, 2005–NMCA–059, 137 N.M. 570, 113 P.3d 393, controlled the issue and required the district court to rule as a matter of law that Estates' assertion of the res judicata defense in its answer was sufficient to overcome arguments of waiver and acquiescence. Facts were argued at the hearing on the res judicata summary judgment motion as though they were not in dispute. The court stated that the case was "a classic claim splitting case," concluding the actions were "separate matters" because the judge hearing the administrative appeals "would have never been able to have heard the original jurisdiction case with the appeal." The court ended by also stating that "I think there has been a sufficient acquiescence and waiver by [Estates]." The parties did not argue that genuine issues of material fact existed on the issue of waiver and acquiescence. We will review the issue of waiver and acquiescence de novo.

## 2. Estates' Acquiescence as to the Asserted Claim–Splitting

{23} The important court-filed documents for consideration on the issue of acquiescence consist of the contract action complaint, filed on February 20, 2004; the administrative appeals, filed in February and March 2004; Estates' answer to the contract action, which included its affirmative defense of res judicata, filed on April 15, 2004; the court's October 18, 2004, memorandum opinion and its November 3, 2004, final order and judgment deciding the administrative appeals; and Estates' motion for summary judgment on res judicata grounds, filed in the contract action on April 12, 2005.

{24} Residents argues that Estates acquiesced in claim-splitting and waived any res judicata defense by participating in the merits of the administrative appeals and in the contract action from February 27, 2004, until April 11, 2005, without making any claim-splitting objection. Residents also argued below and also now argues on appeal that Estates should be estopped from asserting res judicata, based on an in-court statement of Estates' attorney in opposition to a motion by individual property owners to intervene in the contract action. That motion to intervene was filed on March 21, 2005, several days before Estates' April 12, 2005, res judicata motion for summary judgment. In a response filed on April 7, 2005, just five days before its res judicata motion, in opposition to the motion to intervene, Estates stated that "[i]t can hardly be argued that the existing Plaintiff will not adequately represent the interests of the proposed intervenors." During argument related to res judicata on June 8, 2005, the court focused on this statement made in opposition to the motion to intervene, as well as on the general and conditional nature of the defense, during a colloquy between Estates' attorney and the court.

[Mr. Sheridan:] That's precisely the situation here. [Residents] filed their con-

tract claim on February 26th; they filed their administrative appeal on February 27th; we answered the contract action in April, and asserted the affirmative defense of res judicata in April. [Residents' attorney] never served any discovery saying, on what do you base—on what facts do you raise the res judicata defense?

THE COURT: Well, let's answer that question today. There was no judgment when you served your answer on which to base res judicata on, except the 1996 judgment.

MR. SHERIDAN: That's correct.

THE COURT: So you had no basis for res judicata of having collateral effect of these proceedings, because you hadn't won the other case, you had no basis to know that there was going to be any res judicata potentially effective.

MR. SHERIDAN: Respectfully, Your Honor, the filing of the res judicata as a defense puts the defendant on notice, that is precisely what *Cagan* held.

THE COURT: Well, it puts them on notice that there may be a res judicata effect, to the extent there was a judgment now that may have res judicata effect.

MR. SHERIDAN: No, no, Your Honor, it puts him on notice that he is in danger of having the judgment in the case in which you had raised the defense used to bar a simultaneously pending case.

THE COURT: Pending cases, yes, unless—unless you are acquiescing, and then how do you overcome the intervening language that was imposed by the defendant which basically says, no, they have every right to proceed and resolve these issues, and they will do so on behalf of the parties that wish to intervene ...

. . . .

THE COURT:—how can you make both arguments?

. . . .

THE COURT: But it has—it has nothing to do with their motion; it has to do with the[ ] position taken by defendants regarding that motion.

After hearing argument on Estates' motion for summary judgment on res judicata grounds, the district court simply stated on the record that there was "sufficient acquiescence and waiver by [Estates]." In its reply brief on appeal, Estates argues that we should disregard the district court's views regarding the statement in the intervention proceeding, because the intervenors' claims were dissimilar to Residents' and did not implicate or give rise to Estates' res judicata defense.

{25} Our Supreme Court adopted the *Restatement (Second) of Judgments* §§ 24, 25 (1982), in *Three Rivers Land Co. v. Maddoux*, 98 N.M. 690, 695, 652 P.2d 240, 245 (1982), *overruled in part on other grounds by Universal Life Church v. Coxon*, 105 N.M. 57, 728 P.2d 467 (1986), and *Cagan*, 2005-NMCA–059, ¶ 19, 137 N.M. 570, 113 P.3d 393. Section 24 of the Restatement, in part, states:

When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

Section 24 also states that "[t]he general rule of this [s]ection ... is subject to the exceptions stated in [Section] 26." (Emphasis omitted.)

{26} *Restatement (Second) of Judgments* § 26(1)(a) (1982), provides, in pertinent part, that:

(1) When any of the following circumstances exists, the general rule of [Section] 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant:

(a) The parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein[.]

Comment (a) to Section 26 states that, because the main purpose of the general rule stated in Section 24 is to protect a defendant from being harassed by repetitive actions based on the same claim, the rule in Section

24 is "not applicable where the defendant consents, in express words or otherwise, to the splitting of the claim." Comment (a) further states:

Where the plaintiff is simultaneously maintaining separate actions based upon parts of the same claim, and in neither action does the defendant make the objection that another action is pending based on the same claim, judgment in one of the actions does not preclude the plaintiff from proceeding and obtaining judgment in the other action. The failure of the defendant to object to the splitting of the plaintiff's claim is effective as an acquiescence in the splitting of the claim.

■ {27} Acquiescence will defeat a res judicata defense. *See Klipsch, Inc. v. WWR Tech., Inc.,* 127 F.3d 729, 734 (8th Cir.1997) (holding that, based on *Restatement (Second) of Judgments* § 26(1)(a), a defendant's failure to object to claim-splitting until after judgment is entered in one action can be regarded as acquiescence in the splitting of the claim); *Ifill v. District of Columbia,* 665 A.2d 185, 193 (D.C.1995) (same); *see also Cagan,* 2005–NMCA–059, ¶¶ 32–33, 137 N.M. 570, 113 P.3d 393 (acknowledging *Restatement (Second) of Judgments* § 26(1)(a), but determining not to apply it to preclude a res judicata defense because the defendant raised res judicata as a defense in a pleading).

■ {28} Estates claims that the district court erred in determining that it acquiesced in or waived Residents' claim-splitting, arguing that there could be no acquiescence or waiver because it asserted the defense of res judicata in its answer to Residents' complaint. Estates principally relies on *Cagan,* 2005–NMCA–059, ¶ 33, 137 N.M. 570, 113 P.3d 393. Estates also relies on two out-of-state cases. *See Wilkins v. Jakeway,* 993 F.Supp. 635, 651 (S.D.Ohio 1998) (holding that by raising the defense of res judicata at the earliest possible time, the defendants did not acquiesce in claim-splitting but put the plaintiff "on notice that he should either move to consolidate or amend his pleadings in order to avoid the potential of res judicata"), *rev'd on other grounds,* 183 F.3d 528 (6th Cir.1999); *see also Davis v. Sun Oil Co.,* 148 F.3d 606, 612–13 (6th Cir.1998) (per curiam) (holding that the affirmative defense of res judicata raised in an answer precluded finding that that party had acquiesced in or waived the splitting of the cause of action). The issue is whether Estates' assertion of res judicata in its answer to the contract action complaint was sufficient by itself as a matter of law to overcome Residents' waiver and acquiescence argument.

{29} The circumstances in the present case require us to analyze the theory of acquiescence in some greater detail than appears to have occurred in *Cagan* and the other cases on which Estates relies. Estates asserted its res judicata defense in its answer filed in April 2004, which was within two months of the filing of the contract action. The defense, which was one among thirteen others listed, read, "[Residents'] complaint must be dismissed because it is barred by the doctrine of *res judicata* and/or collateral estoppel." The defense was asserted about six months before October 18, 2004, the date on which the issues in the administrative appeals were decided. At no time until its motion for summary judgment in the contract action in April 2005 did Estates indicate to what the res judicata defense asserted in its answer specifically pertained. As indicated earlier in this opinion, at the argument on Estates' summary judgment motion in June 2005, the district court in fact pointed out that one might perceive that the defense was intended to be based on the judgment in the 1996 action. The court stated:

There was no judgment when you served your answer on which to base res judicata . . ., except the 1996 judgment. . . . So you had no basis for res judicata of having collateral effect of these proceedings, because you hadn't won the other case, you had no basis to know that there was going to be any res judicata potentially effective.

Further, as indicated earlier in this opinion, just before Estates filed its res judicata summary judgment motion, Estates opposed intervention of individual property owners on the ground that Residents could adequately represent their interests. The district court questioned this, apparently feeling that Estates could not lead the court down that path

and then shortly afterward veer in a different direction.

{30} As an introductory matter, under the circumstances of claim-splitting in this case, we do not see the issue as one of waiver; instead, we focus on acquiescence under Section 26(1)(a). *See Davis*, 148 F.3d at 612–13 (addressing both waiver and acquiescence under *Restatement (Second) of Judgments* § 26(1)(a)); 18 James Wm. Moore, *Moore's Federal Practice* § 131.24[1], at 74 (3rd ed.2007) (indicating that "[w]aiver by acquiescence" is a form of acquiescence, but different than simply allowing two simultaneous actions on the same claim to proceed without objection).. It is clear that the barrier Residents face in asserting acquiescence is our decision in *Cagan*. We therefore discuss *Cagan* in some detail. We also discuss *Davis* and *Wilkins*.

{31} In *Cagan*, having faced attacks on their February 2000 42 U.S.C. § 1983 (1996) action for failure to prosecute, on September 13, 2002, the plaintiffs in *Cagan* filed a second action asserting breach of contract and other claims. *Cagan*, 2005–NMCA–059, ¶¶ 1–4, 137 N.M. 570, 113 P.3d 393. On November 13, 2002, the defendants asserted their res judicata defense to the second action. *Id.* ¶ 5. The first action was dismissed on December 4, 2002. *Id.* Within two months of the dismissal of the first action, the defendants filed a motion for a protective order and a motion to stay discovery in the second action, at the same time stating their intention to file a motion for summary judgment asserting the res judicata bar. *Id.* ¶¶ 5, 33. The defendants then filed their motion for summary judgment based on res judicata two months after the dismissal. *Id.* ¶ 5.

{32} This Court in *Cagan* rejected the plaintiffs' argument that the defendants consented to claim-splitting by failing to inform the district court at a hearing on dismissal of the first action that res judicata might bar the second action. *Id.* ¶ 33. This Court stated:

> Although [the p]laintiffs argue that the [defendants'] motion for protective order and subsequent summary judgment motion did not constitute an objection to claim splitting because they were filed after [the

first action] was dismissed, the [defendants] raised the affirmative defenses of collateral estoppel and res judicata in its answer, which was filed while both cases were pending. The [defendants'] acts were sufficient to bring to the attention of the district court and [the p]laintiffs that the [defendants] objected to claim splitting.

*Id.* It appears that, in referring to "[t]he [defendants'] acts," this Court was including not only the assertion of the affirmative defense of res judicata, but also the defendants' acts to specifically bring to the attention of the district court that they objected to claim-splitting, i.e., the defendants' motions for stay and for protective order.

{33} In *Davis*, the plaintiffs sued the defendant in state court in May 1991, alleging nuisance, breach of contract, and fraud. 148 F.3d at 608. A referee tried the state court case in September 1993 and issued a report to the court in December 1993 recommending judgment against the defendant for damages for breach of contract. *Id.* In between the trial and the report in this state court action, the plaintiffs in October 1993 filed a federal court hazardous waste action under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(B). *Davis*, 148 F.3d at 608. In its answer in the RCRA action, the defendant relied on the doctrine of res judicata as a defense. *Id.* at 613.

{34} In July 1994, following a pretrial conference, the federal court in *Davis* "issued the first of a series of orders staying proceedings pending the resolution of the litigation in state court." 148 F.3d at 608. In March 1995, the state court issued a decision adopting the referee's recommendations, and this decision was affirmed in the state court of appeals in January 1996. *Id.* At some point, the federal district court, relying on the defendant's pleading asserting res judicata, held that res judicata applied. *Id.* at 612–13. In the *Davis* opinion, the dissent asserted that the defendant had acquiesced and that the district court's application of res judicata was erroneous. *Id.* at 613 (Boggs, J., dissenting in part). In response to the dissent, the majority in *Davis* stated that the district court did not err in holding that the

res judicata doctrine applied and further stated: "We conclude, moreover, that the defense was not waived in the district court. Having stated in its answer that '[the p]laintiffs' claims are barred by the doctrine of res judicata,' [the] defendant may rely on this defense and we find no error in the district court's determination." *Id.* at 612. Further, in discussing Section 26 of the *Restatement (Second) of Judgments* relating to acquiescence, the majority in *Davis* stated that the defendant "defended on the doctrines of both waiver and res judicata," and that "[the] plaintiffs were not treated unjustly and that they had fair notice of the defendant's claim of res judicata." *Id.* at 612–13 (emphasis omitted).

{35} In *Wilkins,* the plaintiff filed a civil rights action in federal court in December 1993 and filed an amended complaint in March 1994. 993 F.Supp. at 641. The pendent state court claims were dismissed by the federal court in September 1994. *Id.* A determination granting qualified immunity was appealed to the federal circuit court which, in February 1996, affirmed the lower court's ruling. *Id.* In the interim, in January 1994, the plaintiff filed a False Claims Act complaint in federal court. *Id.* at 641–42. In March 1995, the plaintiff filed a second amended complaint in that second action. *Id.* at 642. In January 1996, the defendants in the second action filed an answer and asserted the defense of res judicata. *Id.* Also, in January 1996, just before the circuit court's ruling in February 1996 in the first action, in a motion in the second action, the defendants indicated that there were serious res judicata difficulties with the plaintiff pursuing separate claims involving the same transaction. *Id.* at 642, 651. From this indication and from the plaintiff's opposition to consolidation of the cases, the court in *Wilkins* determined that the plaintiff had "notice of the possibility of claim preclusion," and also that the plaintiff should have been on notice that a judgment in either of the two cases could bar the claim in the other case. *Id.* at 642, 651. The court held that the defendants' defense and claim-splitting concern in January 1996 "put [the p]laintiff on notice at the earliest possible time that [the d]efendants opposed [the p]laintiff's tactic of

trying two cases in the same forum." *Id.* at 651.

{36} In both *Cagan* and the present case simultaneous actions existed, and in each the defendants filed res judicata defenses two months after the filing of the action sought to be dismissed. The defendants in *Cagan* then filed a motion for a protective order and a motion to stay discovery, and then a motion for summary judgment, some four or five months after the start of simultaneous actions, September 13, 2002, to January or February 2003. 2005–NMCA–059, ¶¶ 4–5, 33, 137 N.M. 570, 113 P.3d 393. In the present action, Defendants filed a motion for summary judgment a year and two months after the start of simultaneous actions, from February 2004 to April 2005.

{37} In *Davis,* the first (state court) action was filed in May 1991; the second (federal court) action was filed in October 1993. 148 F.3d at 608. We do not know when the answer was filed in the federal court action raising res judicata, but one can assume it was filed as early as November 1993. In July 1994, the court in the federal action issued a stay pending the resolution of the state court action. *Id.* In March 1995, the state court adopted the referee's December 1993 recommendation of judgment against the defendant. *Id.* From these dates, it would appear that the defendant sat for a number of months, from October 1993 to sometime approaching July 1994, before any action was taken to preclude the continuing claim-splitting.

{38} A distinguishing feature between *Cagan* and *Davis* and the present case is the time the defendants sat before acting to prevent the ongoing litigation in simultaneous actions. The defendants in *Cagan* sat for somewhere between three to five months before acting to preclude the continuing claim-splitting; whereas, in the present case, Estates sat for a year and two months before acting. The period of inaction in *Davis* was several months longer than in *Cagan.* Also significant in our view is that neither *Cagan* nor *Davis* discusses the extent of the litigation activity that occurred in the actions that the defendants sought to dismiss under res

judicata. In the present case, both sides actively litigated both actions, and in particular, from February 2004 until Estates filed its res judicata motion in April 2005, the parties pursued considerable activity in the contract action, none of which was aimed at relief from the disadvantages to Estates of claim-splitting. Indeed, Estates acknowledges that Residents has "alleged 'vigorous participation in both actions without objection for more than a year,'" and further indicates that this and other facts "are undisputed." Further, neither *Cagan* nor *Davis* analyzes why an objection to claim-splitting need not be made or a stay of proceedings should not be pursued, or why a defendant, the recipient of protection by objecting early-on to claim-splitting, should be permitted to sit by and take no affirmative action to obtain relief from claim-splitting.

{39} *Wilkins*, in our view, is also distinguishable. The *Wilkins* court determined both that a specific claim-splitting objection was made by the defendants and specific objections to consolidation were made by the plaintiff in a joint motion before the court, and importantly, the court also determined that the defendants acted at the earliest possible time. 993 F.Supp. at 651.

{40} If *Cagan* stood for the proposition that including a res judicata affirmative defense in an answer is sufficient by itself to overcome any claim of acquiescence or waiver, we would be hard pressed to overcome it. However, we do not read *Cagan* to set such a bright-line rule on the issue. Rather, we think it the better policy to consider each case on its own particular facts. *Cagan* does not tell us why the generally stated defense of res judicata, when claim-splitting is specifically at issue, should remain effective without time limitations where there is no action on the part of the defendants to obtain expeditious relief from the claim-splitting. The doctrine of res judicata, when claim-splitting is involved, exists, after all, primarily for the protection of a defendant, such as Estates, from the burdens of multiple litigation of the same claims, including unnecessary expense and the possibility of inconsistent results. Moore, *supra*, at 73 ("One of the primary purposes of the claim preclusion doctrine is to protect a defendant from being harassed by repetitive actions based on the same claim. This purpose is not operative when a defendant agrees, expressly or impliedly, to split the claim. . . . Acquiescence . . . occurs when a defendant allows two simultaneous actions on the same claim to proceed without objection." (citation and footnotes omitted)). *Cagan* does not discuss this policy. Other than to cite *Cagan, Davis*, and *Wilkins*, Estates has not presented any policy or rationale to support its inordinate delay.

{41} Furthermore, we fail to see why a burden to expeditiously seek relief should not be placed on a defendant who objects to claim-splitting. The defense is available principally to protect a defendant from having to expend resources to defend two claims arising from the same transaction. In many instances whether alleged claim-splitting is objectionable is anything but a simple issue. If a defendant sees two actions as detrimental to the defendant's interests, it should be incumbent on the defendant to specifically attack the claim-splitting by obtaining court relief at the earliest feasible point.

{42} Under the circumstances in the present case, we therefore have considerable difficulty permitting Estates' generally stated defense of res judicata to withstand Residents' acquiescence argument. Estates' conduct was antithetical to the purpose for the doctrine of res judicata, as expressed in *Myers v. Olson*, 100 N.M. 745, 747, 676 P.2d 822, 824 (1984), that the res judicata doctrine is invoked to protect litigants from the burden of multiple litigation and to promote judicial economy.

{43} The analysis in *Klipsch, Inc.* is consistent with our view in the present case that Estates acquiesced. In *Klipsch*, the plaintiff filed its first action for debt in July 1995. 127 F.3d at 732. On August 15, 1995, the defendant paid the debt and the court dismissed the action on November 6, 1995. *Id.* at 732, 734. The plaintiff filed its second action, for trademark infringement, on August 15, 1995. *Id.* Thus, both actions were proceeding simultaneously until November 6, 1995. *Id.* at 734. Not until September 17, 1996, more than a year after the plaintiff had filed its second action and some ten months

after dismissal of the first action, did the defendant specifically assert that the second action was barred by the dismissal of the first action. *Id.* at 732.

{44} Based on the *Restatement (Second) of Judgments* § 26(1)(a), the court in *Klipsch* held that the defendant acquiesced and stated that "[i]f a defendant chooses not to make the objection that another action based on the same claim is pending, that defendant has waived this protective aspect of res judicata and acquiesces to the splitting of the claim." 127 F.3d at 734–35. In support of its holding, the court determined that the defendant "had ample opportunity to object" before the judgment in the first action and then waited a lengthy period of time before actually moving to bar the second action based on res judicata. *Id.* at 735. We think that the Restatement's specific claim-splitting rule is intended to require defendants to act expeditiously to object to claim-splitting and to not simply rely on a generally stated res judicata defense for protection against assertions of waiver and acquiescence. *Klipsch* drives this notion home. *See also Funkhouser v. Hurricane Fence Co.*, 524 S.W.2d 780, 783 (Tex.App.1975) ("By failing to file in either action a plea of another cause pending, or to move for consolidation, or in any manner to bring to the attention of the trial court and the plaintiff the fact that the defendant objected to the splitting of the cause of action, the defendant has consented to the splitting of the cause of action.").

{45} We apply Section 26(1)(a) to preclude Estates' res judicata defense. We disapprove of *Cagan* to the extent it can be read to stand for the proposition that an affirmative defense is sufficient by itself to overcome a claim of acquiescence.

## II. Ambiguity and Interpretation of the Settlement Agreement

### A. Revisiting the Parties' Positions and the Rulings in the District Court Proceedings

{46} Residents and Estates attached different meanings to the settlement agreement. At their essential levels, the parties' positions in the litigations were as follows.

Residents' position was that the settlement agreement was ambiguous and, properly interpreted, reflected an intent that the vision statement constituted restrictive covenants to run with the land in the commercial area. Estates' position was that the settlement agreement was unambiguous. The development plan process through the City's administrative considerations and public hearings would be determinative as to what types of use and design restrictions would be required for the commercial area. Estates sought and obtained City approval of the Thornburg plan as it was presented.

{47} The district court indicated in the summary judgment proceeding on contract interpretation that it did not see the circumstances as "contract zoning," noting that "Thornburg may be fully entitled now to build their project under what is the existing master plan ... yet, plaintiff[ ] may still have damages ... for breach of what are contract ... provisions that were never effectuated and carried out." Thus, the court did not think it could enjoin the City or the project based on the master plan; instead, the court thought that the project could move forward, leaving Residents to its contract claim. In the court's view, the City was not affected or bound by the contract provisions. The issue to be determined, necessitating a trial, was whether, as between Estates and Residents, the settlement agreement created covenants and restrictions that ran with the property and attached to it as against any successor in interest.

{48} In its findings of fact and conclusions of law, the court saw the issues for decision as (1) whether the settlement agreement created any enforceable contract rights in favor of Residents, and (2) whether any contract rights survived the approval and recording of the 1996 master plan. The court clarified how it viewed the parties' principal assertions, namely, that: Residents had asserted that the vision statement created contractual rights and restrictions which survived the recording of the master plan and constituted covenants running with the land; and that Estates had asserted that the vision statement only created the conceptual guidelines to be included in the master plan and did not

create any enforceable rights or restrictions in favor of Residents which survived the recording of the master plan. After finding that the settlement agreement was ambiguous, the court then expressly found that the language in the settlement agreement and parol evidence established that the settlement agreement "created enforceable contract rights in favor of [Residents] and restrict the Commercial Property." The court found that these "binding and continuing restrictions upon the future development of the Commercial Property ... survived the approval and recording of the [master plan]," and further found that the restrictions "must be placed as permanent restrictions on the Commercial Property by [Estates] ... as soon as legal lots or parcels of record are established for the Commercial Property."

{49} The court followed with conclusions of law basically repeating these findings and concluded, as well, that "[t]he contractual rights and restrictions ... constitute restrictions and covenants running with the land in perpetuity, binding upon the heirs, successors and assigns of [Estates]." The court also expressed Estates' duties as being "to create and record the restrictions" and stated these duties "are enforceable obligations under the [settlement agreement]." Because another division of the district court had already affirmed the City's approval of the Thornburg plan, and noting that the Thornburg plan as approved did not create legal lots or parcels of record against the commercial property, the court concluded that Estates' obligation had not yet matured or run. The restrictions were to be placed as permanent restrictions as soon as legal lots or parcels of record were established and before "any transfer ... to any purchaser or owner ... as it may be severed from the remaining larger parcel of property identified in the [master plan]."

{50} Through these findings and conclusions, the court essentially determined that Estates agreed that certain restrictions in the vision statement, although incorporated in the master plan, would nevertheless be considered restrictive covenants running with the land that would have to be recorded by Estates at a future date; yet other restric-

tions in the vision statement which were also incorporated in the master plan would only bind the property if required by the City in the development proceedings.

## B. Contract Interpretation—Rules and Standard of Review

{51} In contract interpretation, our Supreme Court abandoned the plain meaning or four-corners standard described in *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 817 P.2d 238 (1991). *See Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993). The standard for determining the intent of parties as to contracts, even unambiguous ones, is enunciated in *Mark V*, 114 N.M. at 781, 845 P.2d at 1235. In determining intent, courts can "consider extrinsic evidence to determine whether the facially unambiguous terms of the release are in fact ambiguous." *Hansen v. Ford Motor Co.*, 120 N.M. 203, 206, 900 P.2d 952, 955 (1995) (deriving this statement from *Mark V* and *C.R. Anthony*). Thus, a court may go beyond the four corners and consider evidence outside the contract itself to explain the purposes or context of the contract. This is called "the contextual approach to contract interpretation, in recognition of the difficulty of ascribing meaning and content to terms and expressions in the absence of contextual understanding." *Mark V*, 114 N.M. at 781, 845 P.2d at 1235 (internal quotation marks and citation omitted). As stated by our Supreme Court in *Mark V*:

> [W]e held in *C.R. Anthony* that even if the language of the contract appears to be clear and unambiguous, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance, in order to decide whether the meaning of a term or expression contained in the agreement is actually unclear.

*Id.* (internal quotation marks and citation omitted). *Mark V* states the methodology in detail as follows.

> The question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court. The court may consider collateral evidence of the circum-

stances surrounding the execution of the agreement in determining whether the language of the agreement is unclear. If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists. At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder[.]

Once the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact.... In order to determine the meaning of the ambiguous terms, the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent.

*Id.* at 781–82, 845 P.2d at 1235–36 (citations omitted).

## C. The Ambiguity Issue

■ {52} Estates presents several arguments. Pointing to paragraph 1 of the Gross letter and to the "[t]he context in which the Settlement Agreement was negotiated," Estates argues that the plain language of the settlement agreement documents shows that the parties only agreed to amend the 1995 master plan. Estates asserts that because Residents' 1996 action challenged the 1995 master plan, it would be reasonable to expect that an agreement resolving that lawsuit would provide for modifying the 1995 master plan. Estates also asserts that the Geiss letter and the master plan conditions that the letter modified were incorporated into the settlement agreement only for the specific purpose of identifying the modifications to the 1995 master plan; and that the Geiss letter was irrelevant for any purpose other than the specific purpose of identifying those modifications. Referring specifically to earlier Gross letters dated June 10 and July 18, 1996, Estates further asserts that in negotiations Residents "repeatedly sought ... *only* to modify the 1995 Master Plan provisions

relating to [the commercial area]." Estates further asserts that "Residents did *not* seek any contractually enforceable restrictive covenants as to the [commercial area]," yet, significantly, at the same time actually required restrictive covenants in connection with other areas of the 1995 master plan, namely, buffer zone and terrain management areas, by demanding in the Gross July 18, 1996, letter that Estates "make an enforceable agreement which burdens the land" as to those two specified areas. If Residents had sought restrictive covenants in the commercial area, Estates argues, Residents "could easily have requested and the parties could easily have documented any future obligation on ... Estates to create and record specific design covenants."

{53} In addition, Estates asserts that the parties' course of performance demonstrated "that paragraph 1 of the Gross letter constituted solely an agreement to revise the 1995 Master Plan." Estates shows that the parties proceeded to revise the 1995 master plan to reflect agreed-upon changes and created the 1996 master plan which was submitted along with the settlement agreement to the City Council for ratification and adoption. Following that ratification and adoption, Residents dismissed its lawsuit seeking to amend the 1995 master plan.

{54} With respect to paragraph 4 of the Geiss letter which refers to Estates' vision statement, and on which Residents relies as being "self-contained" and constituting " 'an independent, categorical restriction[ ]' enforceable in contract," Estates maintains that, when construed in light of paragraph 1 of the Gross letter, there exist "no objective manifestations of any intent to establish self-contained independent categorical restrictive covenants on the Commercial Area." All that the Geiss letter can be read to provide, Estates argues, is revision language for the 1995 master plan; whereas, "paragraph 1 of the Gross letter is completely silent on the alleged grant of enforceable restrictive covenants upon the Commercial Area."

{55} Finally, Estates argues that to create, in a contract, a restrictive covenant to run with the land requires a clear expression of

intent in plain and direct language, and that, because restrictive covenants are not favored, doubts or ambiguities regarding their existence and enforcement will be resolved against restriction. Thus, Estates concludes that the lack of any clearly expressed intention to create a restrictive covenant related to the commercial area requires a determination that the settlement agreement is unambiguous, and that no such intention can or should be implied.

{56} Residents relies not only on the documentary history leading up to the settlement agreement and its approval by the City along with adoption of the 1996 master plan, but also on the testimony of Residents' president, Lewis Pollock, to support the court's determination that the settlement agreement was ambiguous and also that the settlement agreement created contractually enforceable covenants. Pollock testified that, in discussions leading up to the settlement agreement, he informed Estates' owners that Residents required an agreement it could enforce against Estates in regard to the commercial area, including building size and architecture. Pollock further testified that he specifically discussed paragraph 4 in the Geiss letter, which relates to restrictions on the commercial area, among other things, and that it constituted a significant aspect of the settlement agreement. Pollock required this because the City was a partner with Estates and therefore had an irreconcilable conflict and, thus, the City was not likely, in Residents' view, to enforce any of Residents' rights against Estates. Pollock understood Estates to have promised, and expressed that he believed Residents could rely on the statement in paragraph 4 of the Geiss letter, that "[the] Vision Statement shall serve as the basis for the ultimate design of the commercial area." Feeling that the Geiss letter was "the main cog" of the settlement agreement, Pollock discussed its content with Estates' representatives, explaining during the discussions why Residents needed a private right of enforcement because of the City's position as a partner with Estates. Pollock understood that what he was discussing with Estates was agreeable to Estates.

{57} We cannot say that the district court erred in holding that the settlement agreement was ambiguous. While it is clear that the parties intended at the time of the settlement agreement to obtain amendment of the 1995 master plan, it is reasonable to conclude that the contractual process clouded the question of the full extent of what the parties intended to accomplish. The settlement agreement refers specifically to "Use and Design Restrictions on the Commercial Area." The vision statement was an integral part of the negotiations and the settlement agreement. The agreement indicates that the vision statement "shall serve as the basis for the ultimate design of the commercial area." The vision statement "visualized" the area "with design covenants *dictating* buildings which are compatible with nearby residential structures and limited to two story heights." (Emphasis added.) The vision statement sets out specific examples of uses and categorically says that they "*will not* be permitted." (Emphasis added.) Further, the vision statement states that "[d]esign standards and covenants *will* limit commercial development" to a certain specific style of architecture and "*will* also limit signage ... and all lighting" in certain respects. (Emphasis added.) Although the vision statement ends by saying that the actual development plan will be submitted to an administrative review process, the statement does not indicate that the design standards and covenants specifically mentioned, if not mandated, could be ignored by either Estates or, for that matter, even the City. Moreover, given his concern about the relationship between the City and Estates, it was apparent from Pollock's testimony that Residents wanted assurance that the City would require Estates to abide by the standards and covenants.

{58} Taking into consideration the conglomeration of documents comprising the settlement agreement, the lack of clarity as to the purpose and meaning of the documents, and the apparent lack of serious resistance to Pollock's concerns that Residents be able to enforce design covenants in the vision statement, we hold that the district court did not err in concluding that the settlement agreement was ambiguous.

### D. The Interpretation Issue

{59} A more difficult issue is whether the settlement agreement created specific restrictive covenants running with the land in favor of Residents that Estates was contractually required at some point to record in order to bind subsequent transferees. Estates contends that the court's findings lacked substantial evidence.

{60} Estates argues that the only evidence that is pertinent is the text of the vision statement and the testimony of Geiss that was responsive to questions that the court had regarding implementation of the provisions of the vision statement. In Estates' view, the documents and Geiss's testimony show that Estates agreed to nothing more than to make the vision statement a part of the master plan, as one of several modifications to the 1995 master plan. Estates sets out several parts of the testimony of Geiss in which he says that the parties did not discuss restrictive covenants and that the discussions centered on modifying the 1995 master plan. According to Geiss, the parties were only trying to find a way to resolve the conditions of approval relating to the 1995 master plan and, in doing so, "find ways to comfort [Residents] on their issues."

{61} Estates quotes what it considers critical Geiss testimony in response to the court's question, "At what point in the development stage do [Estates'] promises have to be implemented?" Geiss stated:

> It is typical in the process at the City ... that covenants[,] conditions and restrictions be filed with a development plan, because you have enough specific information that has been approved by the Planning Commission. Again, Your Honor, once you get your approval at the Planning Commission, you have to record it, and it's in that process of working that out, that these get written.
>
> ... [T]he Planning Commission has stated that the Thornburg Development Plan complies and meets the criteria of the Vision Statement. In the process that follows, it is the function of the City staff to match up the requirements imposed by the master plan or any conditions of the actual approval, so that all of the requirements

are met by the time that ... the development plan is recorded.

> I guess what I'm trying to say is, if we could just get out of this court and get on with the development of the Thornburg building, we would be on our way to recording covenants that are implied by this Vision Statement.

Estates' position is thus made clear: the documents and Geiss's testimony, being what Estates views as the only evidence on the issue, require the conclusion that "responsibility for creating the design covenants referenced in the Vision Statement resides with the developer and the City in its approval and recording of a development plan." This position rules out any rights of Residents beyond that of opposing the Thornburg plan in the City administrative process. All Estates agreed to do, according to Estates, was to make the vision statement part of the master plan, and to leave recording of design covenants solely up to the City administrative process. Estates' interpretation, of course, leaves no room for an interpretation based on the evidence that the settlement agreement, including the vision statement, contractually creates restrictive covenants that run with the land and that requires Estates to record no matter what the City approves with respect to the development plan.

{62} Also in support of its lack of substantial evidence argument, Estates further argues that the interpretation given the settlement agreement by the court is contrary to the presumption in contract law that one is not to read into a document a term that could easily have been included but was not included. Estates also argues that courts are not to read restrictions on the use and enjoyment of land into a covenant by implication, citing *Hill v. Community of Damien of Molokai*, 1996–NMSC–008, 121 N.M. 353, 911 P.2d 861, in which, in considering the applicability of an existing restrictive covenant to certain property, our Supreme Court stated that it was to be "guided by certain general rules of construction." *Id.* ¶ 6. One rule was that "if the language is unclear or ambiguous, we will resolve the restrictive covenant in favor of the free enjoyment of the property and

against restrictions." *Id.* Another was that the Court would "not read restrictions on the use and enjoyment of the land into the covenant by implication." *Id.*

{63} The problem with Estates' entire approach is that the primary evidence before the district court on the issue at hand was the combination of documents constituting the settlement agreement, together with the testimony of Geiss and Pollock. It is the reasonable inferences to be drawn from the documents and testimony that, in this case, tells the tale in regard to whether there was substantial evidence to support the district court's findings. The parties obviously attach different meanings to the settlement agreement. The Geiss letter referred to and attached Estates' vision statement, which was to satisfy Residents' requirements related to use and design restrictions, in that the restrictions would serve as the basis for the ultimate design. Although the vision statement indicated it was how Estates "visualized" the commercial area, the statement contained specific statements by Estates using mandatory language indicating that the design "covenants" would dictate "buildings which *are* compatible with nearby residential structures and limited to two story heights," and further stating that certain large scale retail users *"will not* be permitted" and that certain "[d]esign standards and covenants *will* limit commercial development." (Emphasis added.) In interpreting an agreement that ended the litigation over amending a master plan, we do not think it unreasonable for the district court to draw an inference that Estates was agreeing that certain covenants could survive the master plan and administrative review process, and that those covenants could be separately enforced. We do not see why the evidence before the court could not cause a question in the court's mind as to why Estates would make the affirmative statements it did yet intend not to be bound by them were the City Planning Commission or Council to decide that the covenants were not required. Nor do we see why there was an insufficient supply of evidence before the court to support reasonable inferences for ultimate findings as to contractual obligations.

{64} While the words "recordable restrictive covenants" were not mentioned by Residents in the negotiations and documents, we note that Geiss did indicate that Estates "would be on our way to recording covenants that are implied by this Vision Statement." Geiss's testimony did not make it clear that Estates had no obligation to carry through on its vision statement representations regarding restrictive covenants if it could persuade the City officials to disregard them in approving a development plan. Even if the court were somehow obligated to accept Geiss's testimony, his testimony does not rule out a construction by the court of the documents and of his and Pollock's testimony that Estates had an obligation to assure that certain of the vision statement covenants were binding no matter what the City decided with respect to the development plan.

{65} *Hill's* property-context rules of construction relied on by Estates applied to already established covenants—that is, *Hill* addressed whether the already recorded restrictive covenants were intended to cover a specific type of property. 1996–NMSC–008, ¶¶ 1–5, 121 N.M. 353, 911 P.2d 861. The present case, on the other hand, addresses whether an agreement creates contractually enforceable restrictive covenants intended to run with the land and further establishes an obligation to record those covenants. Thus, in *Hill*, the lower court was required to interpret an existing, recorded covenant, while in the present case, the court was required to interpret contract language in regard to whether it created covenants required to be recorded. We do not think that the *Hill* rules of construction should be applied in the present case to overturn the district court's interpretation of the agreement to create covenants and a duty to record them.

{66} Estates nevertheless argues that a contractual allocation cannot be found as a result intended by the parties when, as here, Residents argued throughout the proceedings that the vision statement itself, perforce, constituted restrictive covenants running with the land, and did not argue that the settlement agreement contractually established a future right in Residents and a

correlative duty in Estates to record restrictive covenants apart from the administrative process consideration and approval of the Thornburg plan. That position, Estates asserts, in fact was rejected by the court for Residents' failure to meet its burden. Thus, Estates argues, "the court erred in searching for an alternative interpretation, which ... Residents did not proffer and which substantial evidence did not support." Estates also appears to argue that the evidence on which the court based its determination of a contractual obligation was offered only in support of Residents' sole, but rejected position, leaving no substantial evidence to support the contract theory that the court latched onto.

{67} We are not persuaded by this over-technical interpretation of the complex and drawn out proceedings. Estates was not denied the opportunity to present evidence or argument on the contractual issue. Estates does not claim that it was denied any such opportunity. Evidence was before the court, and the court could consider the evidence on any issue that was fairly litigated. The distinction Estates advances is, to us, one without a difference under the circumstances.

{68} We adhere to our substantial evidence review standards. "[W]hen considering a claim of insufficiency of the evidence, the appellate court resolves all disputes of facts in favor of the successful party and indulges all reasonable inferences in support of the prevailing party." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177. "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990). "[W]hen there is a conflict in the testimony, we defer to the trier of fact." *Buckingham v. Ryan*, 1998–NMCA–012, ¶ 10, 124 N.M. 498, 953 P.2d 33. In reviewing a substantial evidence claim, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters*, 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177. "Additionally we will not reweigh the evidence nor substitute our judgment for that of the fact finder." *Id.* In reviewing a sufficiency of the evidence claim, the reviewing court views the evidence in the light most favorable to the prevailing party, and disregards evidence and inferences to the contrary. *Weidler v. Big J Enters., Inc.*, 1998–NMCA–021, ¶ 30, 124 N.M. 591, 953 P.2d 1089. While Estates' position is arguable, it is not the only reasonable construction of the documents and testimony that is possible. We hold that there exists substantial evidence from which the district court could draw reasonable inferences to support its interpretation of the settlement agreement.

**RESIDENTS' APPEAL**

{69} Residents complains that the district court erred in failing to include as binding and enforceable restrictive covenants running with the land all of the design and development standards discussed in the vision statement. Residents asserts that there can be no logical or legal distinction between the four specific restrictions the court determined were binding and enforceable and the others in the vision statement. Residents states that paragraph 4 of the Geiss letter references the vision statement "in its entirety as being the restrictions" and states that the use and design restrictions in the vision statement make up a single set of standards. That is, the vision statement was a single document that established use, design, size, and scale standards for the development of the entire commercial area and, once the court determined the parties' intent and that Residents had contract rights in regard to the design and development standards in the vision statement, "as a matter of law these rights extended to all design and development standards within the Vision Statement." Thus, in Residents' view, there was no legal justification for not including all such standards in the court's ruling as to binding and continuing restrictions running with the land to be recorded by Estates. To unbundle Residents' rights, Residents argues, is illogical.

{70} This issue raises only questions of law, which we review de novo. *See Strata Prod. Co. v. Mercury Exploration Co.*, 121 N.M. 622, 627, 916 P.2d 822, 827 (1996) (stat-

ing that the appellate court is deferential to facts found by the trial court but reviews conclusions of law de novo); *Ferrell v. Allstate Ins. Co.,* 2007–NMCA–017, ¶ 7, 141 N.M. 72, 150 P.3d 1022 (stating that whether the court made a legal error is reviewed de novo), *cert. granted,* 2007–NMCERT–001, 141 N.M. 164, 152 P.3d 151.

{71} The district court carefully chose to divide the restrictions into those that were "satisfied" by their incorporation into the master plan and those that "survived" their incorporation into the master plan.

> 22. The Court ... finds that the majority of the enforceable contract rights in favor of [Residents] and restricting the Commercial Property have been satisfied by the incorporation of the Vision Statement in the 1996 Masterplan.

> 23. The Court further finds that certain design and development restrictions within the Vision Statement create enforceable contract rights in favor of [Residents] and place binding and continuing restrictions upon the future development of the Commercial Property which survived the approval and recording of the 1996 Masterplan.

The court obviously examined the fact that conditions became a part of the 1996 master plan. As Estates points out, a city-approved master plan such as the 1996 master plan serves "as a policy guide in the decision-making process" in land development proceedings. *W. Bluff Neighborhood Ass'n v. City of Albuquerque,* 2002–NMCA–075, ¶ 33, 132 N.M. 433, 50 P.3d 182, *overruled in part on other grounds by Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n,* 2003–NMSC–005, 133 N.M. 97, 61 P.3d 806. The court also examined the Geiss and Gross letters and the vision statement, and concluded that the parties were agreeing to something beyond their reliance solely on how city planners would apply the master plan to a proposed development. The court appears to have resolved the confusing facts and opposite meanings attributed by the parties to those facts by distinguishing the more defined and specific covenants from the less defined and more conceptual covenants—the latter being incorporated into the 1996 mas-

ter plan solely for administrative treatment, and the former constituting residual, enforceable contract rights that "survived" their incorporation in the master plan to become contractually binding on Estates and the land.

{72} We will not quarrel with the creative and, we think, reasonable manner in which the district court resolved the ambiguities and differences. This was a complicated property development case because of the intermixture of incorporation of design and use concepts in a master plan and statements as to specific restrictions in a private contract. The parties created the complexity and ambiguity, and the district court engaged the issues with deliberation, giving the parties full opportunity to present the evidence and argue their positions. How to decide the issues in this case was no easy task. It is likely that the case could have gone either way and that the result either way would have been supported by substantial evidence and law. As this case stands, the district court reasonably determined that the settlement agreement was ambiguous, and the court's interpretation of the terms of the contract was reasonable and supported by substantial evidence. Residents have not convinced us through argument or any persuasive authority that the court erred in the distinction it made with respect to the restrictions.

### III. The Rule 12–213(A)(3) Issue

{73} Residents attacks Estates' brief for noncompliance with Rule 12–213(A)(3) NMRA by failing to include in the summary of proceedings the substance of the evidence bearing on the proposition the party is advancing. *See id.* Estates contends that it primarily advances the proposition that the court erred in denying its motion for summary judgment, and that Rule 12–213(A)(3) does not apply because it applies only when a party challenges "a verdict, judgment or finding of fact." According to Estates, the rule applies only to that part of the court's determinations that followed trial and involved findings of fact, and in that regard Estates argues that it has complied with the rule.

{74} Whether the rule applies to asserted error in denying summary judgment, and if it does, whether the evidence Estates sets out in its brief in chief complied with the rule, we do not see a reason for us to address the legal issue raised. We are satisfied that the substance of the evidence was sufficient for us to address the issues presented in this appeal.

## CONCLUSION

{75} We affirm. The district court did not err in denying Estates' motion for summary judgment based on res judicata on grounds of waiver and acquiescence. Nor did the district court err in its determinations with respect to restrictive covenants.

{76} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE and CYNTHIA A. FRY, Judges.